## VANOVER et al. v. COMMONWEALTH.

Court of Appeals of Kentucky.

March 9, 1951.

J. E. Childers, Pikeville, for appellants.

A. E. Funk, Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., J. A. Runyon, W. A. Daugherty, Pikeville, for appellee.

STANLEY, Commissioner.

Roy Conway, the sheriff of Pike County, was lured from his home on a false call for duty and assassinated about eleven o'clock of the night of July 28, 1950. The appellants, Tommy Vanover and Hubert Vanover, half brothers, have been convicted of the crime and sentenced to life imprisonment. As is usual and proper where proof of the charge rests on circumstantial evidence, the testimony covered a broad range. We summarize it very briefly in considering the argument that the evidence was not sufficient to take the case to the jury.

Mr. Conway was shot in the back under the street light in front of his home and died instantly. A neighbor heard the shot and then someone running through a narrow, dark passageway between her house and a garage, striking or stumbling over a gas pipe across it, and going on towards a used car parking lot in the rear. Her son and a police officer quickly discovered footprints and found a German army rifle in the bushes in the passageway. It had the odor of freshly exploded powder. Guards were placed at each end to prevent intrusion. The next morning a plaster cast was made of a very distinct impression of a rubber tennis shoe, the heel of which had sunk well into the earth at an angle such as is made where the foot turns when one falls. It is a reasonable conclusion, considering these facts and the

location of the body, that the assassin was concealed near the front entrance of this narrow passageway between the buildings. A bloodhound picked up the trail but lost it at the parking lot.

■ It is contended that the evidence of the shoe tracks was incompetent because a number of people had been milling around the scene. We think the integrity of the place was proved and that the evidence was competent. It was especially made so by further developments pertaining to the specific footprint.

Sheriff Conway had been very diligent in enforcing the law against gamblers and bootleggers. It was brought out by defendants' counsel that threats had been made against him and that he had been previously shot at; also, that as he prepared to go out on the fatal night his wife warned him of danger, but, nevertheless, he went on. He had said he had been offered $75,000. to resign his office. The testimony of the defendants is that Tommy's business was that of raising and racing coon dogs and swapping pistols. His brother, Hubert, added to his vocations that of playing poker. Hubert was a barber and in the dog business too. It appears, however, their principal business was dealing in illegal liquor, Pike County being a local option territory. They had a place in the county at Rocky Gap for that business. They had been raided seven or eight times by the sheriff and his deputies, and the officers were fired upon while destroying a moonshine still in the neighborhood. Hubert had recently filed a civil suit against Conway charging an illegal search of his premises.

About a month before the killing, while the officers were up in that neighborhood, Hubert Vanover and his father, John Vanover, came along in an automobile. According to the officers, Hubert was drunk and driving and tried to run them down. An officer shot at a tire. There was considerable shooting between the occupants of the car and the officers. When finally run down, the car was loaded with whiskey. But according to the defendants, the officers had fired upon them without any cause whatever and had treated them unjustly. When they had been taken to jail, they sent a messenger that night to notify Tommy. He was received by Tommy standing in the door with a pistol in his hand. When the messenger identified himself, the defendant said, "It's a good thing you hollered. I am expecting them up to raid, and when they come I am going to give them a warm welcome." There were other occasions of similar character, particularly one where the officers were fired upon from ambush as they approached the Vanovers' place with a search warrant. On a Saturday night, about two weeks before the killing, Tommy Vanover checked his pistol with the proprietor of a dance hall. On that occasion, being asked by a friend why he carried the pistol, he responded, "Well, Roy Conway sent me word he would kill me, and I am going to protect myself."

In the afternoon of the night of the murder both appellants were at the Conway corner on two occasions. First, about one o'clock and later around six o'clock. They may well have been viewing the situation, but they say they were at the garage and used car lot seeing about getting an automobile and that they talked with certain persons. Those persons denied it. In the late afternoon they bought two pairs of what are commonly called tennis shoes, having rubber soles and canvas tops. The sizes were 8 and 11. The defendants testified they bought these shoes to hunt with and to use in training and washing their dogs in the creek. After getting the shoes, they went by bus to the home of a friend 8 or 10 miles in the country and borrowed his automobile.

They had spent the night in the apartment of two girls to which Tommy had a key. He had frequently stayed there, but Hubert had not. When the young ladies left for a dance about half past nine with an escort, they left Tommy alone sitting on the porch. He was drinking and said he did not feel like going with the other girl. When the girls returned around one o'clock in the morning, they noticed two pairs of tennis shoes on the porch. They found both men fully

dressed asleep in their bed. They were aroused, or at least Hubert was. He was drunk. Tommy had a loaded revolver under his pillow or on a table within reach. The girls spoke of the sheriff having been killed, but neither man made any response. Several witnesses had seen Hubert on the street around 10 or 10:30 o'clock. Joe Coleman, a constable, whose name was used in the false call to the sheriff, talked with him about nine o'clock. He was then wearing blue overalls and had on brown shoes. When the girls found him in their bed he had on gray pants. This apartment was within seven minutes walking time of Conway's corner and, of course, much less by automobile. There was a telephone convenient to the apartment from which the false call might have been made.

The next morning, upon a search of the apartment, the officers found two pairs of tennis shoes, sizes 8 and 11 in the bathroom. They were wet. One had some bits of soil around the soles indicating recent wear. Two revolvers fully loaded were concealed in a small table compartment. Several shotgun shells were also found. Some of the bullets had the sharp end or round point clipped off and a small hole hollowed out in the end. It is explained that such bullets explode or split into fragments inside a body or other object. An X-ray examination of the body of Mr. Conway showed the bullet that struck him had exploded into fragments. There were two or three pairs of overalls in the apartment. One pair appeared to have been recently worn, for it was damp and had bits of soil on the cuffs and one knee. Tommy Vanover had a skinned place on his leg. Pinned inside another pair of overalls was a shotgun with the stock and barrel separated. A pair of men's rubber gloves was also found there. The gun with which Conway was killed had no fingerprints on it. It is fair to say also that there were some hypodermic needles and some medicine or chemicals and that the defendants testified the gloves and this equipment were used in their business of doctoring dogs. None of this arsenal or other items were in the apartment when the two girls left for the dance around ten o'clock that night.

The tennis shoes and the plaster cast of the footprint in the passageway were examined by the Federal Bureau of Investigation. An agent introduced enlarged photographs of both and pointed out very conclusively that the print had been made by one of these shoes. The figure 11 appeared on the cast very clearly. Like fingerprints, there were several distinctive corresponding characteristics affording clear identification.

The German rifle with which apparently Conway was killed was traced back to the Irick family. In brief, they claimed it had unaccountably disappeared from their home. These witnesses were reluctant. On Sunday before the murder, Tommy Vanover, caparisoned as usual with two revolvers, was talking to a friend about a foreign made rifle. He wanted to know if it was registered. The rifle found at the scene had all numbers freshly filed off. In this same conversation his friend asked Tommy whether he had shot at Conway on a previous occasion, and he answered, "I am not telling on myself." He also made some remark like, "I have got a difference" with the sheriff. This friend was not a willing witness and somewhat equivocal, but this is the real substance of his testimony.

██ The circumstantial evidence is perfectly consistent with guilt. We proceed to examine the defendants' evidence, additional to that already noticed. Sometimes the defendant is able clearly and certainly to explain the circumstances and show they are consistent with innocence so as to bring the case within the well established rule that if the evidence on the whole is as consistent with innocence as with guilt, it is not sufficient to sustain a conviction. Fyffe v. Commonwealth, 301 Ky. 165, 190 S.W. 2d 674.

The defendants do not deny their enmity towards the sheriff. Their notion of having been abused still rankles in their bosoms as is reflected in their brief. They deny any knowledge of the German rifle and, of course, deny having killed Conway. In explanation of the rubber soled shoes being wet, the defendants testify they had

washed them the next morning in order to take the stiffness out of the canvas; a method they learned in the army. Tommy, drunk, had remained at the girls' apartment the entire night. Hubert was on the street looking for and did obtain some whiskey for Tommy and himself. He had returned to the apartment a few minutes of 11 o'clock and never left thereafter. A witness testified that he saw Tommy on the porch of the apartment "about 11" with his head down like he was asleep or dead drunk. But the Commonwealth introduced evidence to show that this witness could not have seen him from the place he said he was, and his testimony was otherwise weakened. Several witnesses testified to seeing Hubert on the streets of Pikeville at times varying from 10 to 10:45 o'clock with a "brown poke" or paper bag in which Hubert says he had his liquor.

The defendants introduced some neighbors of the deceased who testify that immediately after the shot they heard a man running rather heavily down the street towards the college gymnasium. This, of course, may have been one of the defendants the other going through the narrow passageway. Another neighbor related that he was sitting in his window in the dark smoking before going to bed and saw a man hurriedly pass in front of his house. His head was bent down and he had a peculiar walk. He passed out of sight, going in the direction from which the shot was immediately fired. He could scarcely have gone over 125 feet after he passed out of the witness' sight. Neither of these defendants was that man. This is a circumstance of importance, but it certainly cannot outweigh the massive evidence incriminating the defendants.

■ The appellants insist the evidence procured in the search of the apartment was inadmissible. They recognize that the two girls who lived there willingly gave their consent to the search but argue they could not consent to the search of the defendants' personal possessions. The case relied upon merely declares that searching a portion of a house occupied by a person not named in the warrant is illegal. Mc-

Mahan's Administratrix v. Draffen, 242 Ky. 785, 47 S.W.2d 716. Though these men had taken over this apartment as their hideout or as guests, it is very certain that the next day when the search was made they had surrendered whatever possession they had obtained by intrusion. Their things were not searched; they were simply found. There is no merit whatever in this contention.

■ The defendants submit there was error in relation to the circuit clerk's testimony concerning some indictments. Defendants' counsel, in the course of his cross-examination of the officers, had sought to show that the Vanovers had not been tried for the affray with the officers and upon other charges, for the purpose of insinuating that there was no merit in the charges. This doubtless led the Commonwealth to show that the indictments had been recently returned. Before the Clerk testified, the court admonished the jury that they were confined to the question of guilt or innocence of the defendants of the charge being tried. The clerk then recited there were indictments returned against Hubert and John Vanover and against John Vanover and Bob Hobson for possessing intoxicating liquor in local option territory, and one against John Vanover for shooting with intent to kill. The court thereupon sustained the defendants' objection and admonished the jury not to consider the evidence concerning the indictments. There was no motion to discharge the jury. Perhaps it would have been better for the court to have examined the indictments proposed to be introduced in advance and ruled them out, but he proceeded according to the usual mode of trial. The course of this proceeding—the preliminary admonition and then the withdrawal of the testimony of the clerk with the subsequent admonition—does not, in our opinion, constitute a prejudicial error.

■ This is a case where not only the life of a man was taken in cold blood, but Society itself was assaulted. In the perpetration of the assassination the lawless element of Pike County made war upon the Government. That is anarchy. A

shocking crime such as this puts law to its severest test. The courts must be careful to maintain their poise and sense of justice and see that those charged are given a trial fair in its conduct and free from inflamed passion, else there may result only the sacrifice of a victim. We have been careful to observe that attitude in the examination of this record, but have had no difficulty in concluding that the chain of circumstances, well-forged by diligent and efficient police officers, is sufficient to justify the verdict of guilt. That the jury considered the evidence without passion or prejudice is manifested by the fact that they did not impose the severest penalty of death, a penalty which the evidence would have justified.

The judgment is affirmed.