Charles Aaron CHUMBLER, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Holly KARIAKIS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Michael KARIAKIS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 91–SC–916–MR, 91–SC–921–
MR and 91–SC–932–MR.

Supreme Court of Kentucky.

Aug. 24, 1995.

Julie Namkin, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for Charles Chumbler.

Marie Allison, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for Holly Kariakis.

Larry H. Marshall, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for Michael Kariakis.

Chris Gorman, Attorney General, Lana Grandon, Carol C. Ullerich, Assistant Attorney General, Criminal Appellate Division, Frankfort, Thomas L. Osborne, Commonwealth Attorney, Paducah, for appellee.

LEIBSON, Justice.

In a joint trial, Michael Kariakis, his wife, Holly Kariakis, and Charles Chumbler were convicted of crimes resulting in the murder of Nelda Chumbler, Charles Chumbler's wife. Michael was convicted of murdering Nelda, and Holly and Charles were convicted of murder by complicity. Michael and Charles were sentenced to life without parole for 25 years and Holly was sentenced to life in prison.

Nelda and Charles were school teachers in Florida. Charles was originally from Kentucky. During December, 1990, Nelda and Charles visited Charles's family in Kentucky. On December 27, around 4:00 P.M., Nelda was shot by a high-velocity weapon, such as a hunting rifle, while feeding the horses on Charles's brother's horse lot. The murder weapon was not recovered. Charles and his four-year old grandson were with Nelda at the time. There were no other eye witnesses.

At first the police believed Nelda's death was caused by a hunter's stray bullet. Approximately a week after Nelda's death, the police changed their theory and believed Nelda was killed by a shooter in a nearby shed.

The Commonwealth's theory of the case was that Michael shot Nelda from the shed and Holly and Charles conspired in the murder. The motive was to obtain the proceeds from Nelda's insurance: Charles was the beneficiary of his wife's retirement benefits as well as her $35,000 life insurance policy which increased to $70,000 if she died of an accident. Nelda and Charles married on November 20, 1987, and executed an antenuptial agreement that day which listed her assets at $200,000 and his assets at $500 and which prevented Charles from inheriting Nelda's estate.

Michael and Charles met in 1979 when Michael, who was 16 at the time, worked stripping tobacco on Charles's farm in the Paducah area. Evidence was presented at trial to allow the jury to infer that Charles and Michael had a homosexual relationship, which Michael and Charles denied. Charles characterized their relationship as a "deep friendship" wherein Charles acted as a foster father to Michael. Charles regularly gave Michael money, bought things for him, and made restitution for bad checks written by Michael and one of Michael's ex-wives. In large part because of the money flowing from Charles to Michael, Charles declared bankruptcy in 1987 and drained much of Nelda's finances after marrying her.

Michael and Holly met in November, 1988. Michael moved to Virginia, where Holly lived, and the two married in April, 1989. In February, 1990, Michael and Holly moved to Palm Harbor, Florida. Holly first met Charles in June, 1989, when he visited Holly and Michael in Virginia, and Holly testified that she met Charles two additional times after that in Florida.

Michael and Holly planned on taking a trip over the 1990 Christmas holiday. On December 26, 1990, after picking up and cashing Holly's paycheck, Holly and Michael drove to a parking lot where Michael had arranged to meet a gun dealer to buy a gun on which Michael had previously placed a deposit. Holly gave Michael $100 to $200, which Michael used towards the $700 purchase price of a unique, custom-built, unregistered .270

caliber rifle with a scope. Michael testified he bought the rifle for Charles to give to Perri Mathis, Charles's adult daughter, as a Christmas present. Holly testified that Michael told her Charles would probably buy the gun from him and that Michael had previously bought guns as investments. Charles testified that he did not ask Michael to buy a gun for him to give to Perri and that Michael never told him he bought it.

After purchasing the gun, Holly and Michael left on their trip. They ended up driving to Paducah, arriving about 1:00 P.M. on December 27. They left the next morning to return to Florida. While in Paducah, the rifle Michael had purchased in Florida was removed from the back seat of their car. There was no sign of forced entry. The rifle has not been found.

The trial took 18 days and the transcript of evidence is 29 volumes. All three defendants testified and denied responsibility for the shooting and claimed it was a hunting accident. The three defendants raise a great many issues and sub-issues on appeal. Some issues are common to all the defendants, others are raised only by one or two defendants. Many of the issues or sub-issues were not properly preserved for appellate review. For the reasons to be stated, we reverse and remand as to all three defendants.

## I. SEXUAL EVIDENCE

Both before and at trial, Michael and Charles objected to the introduction of evidence regarding their sexual behavior, preferences or orientation. They suggested that the Commonwealth could prove a "close relationship" between the defendants without "crossing the line into proof of homosexuality." Charles offered to stipulate to a "strong relationship" between Michael and Charles.

Charles and Michael claim that evidence regarding their sexuality was irrelevant or, if relevant, should have been excluded because the prejudicial nature of the evidence outweighed the probative value. The Commonwealth responds that proof of their homosexual relationship was relevant to establish motive for Nelda's murder and that the evidence was not unduly prejudicial.

Although no Kentucky cases specifically address the introduction of evidence of homosexuality, such evidence may be analogized to evidence of an extramarital affair. In *Barnett v. Commonwealth*, Ky., 763 S.W.2d 119 (1988), we reversed in part because of the admission of evidence of an extramarital affair which had ended twenty-one months prior to the murder and lacked any connection to the crime. This Court has held that evidence of extramarital affairs is irrelevant and error in a number of cases. *Stallings v. Commonwealth*, Ky., 556 S.W.2d 4 (1977); *Pruitt v. Commonwealth*, Ky., 487 S.W.2d 940 (1972); *Brown v. Commonwealth*, Ky., 275 S.W.2d 928 (1955); *Acres v. Commonwealth*, Ky., 259 S.W.2d 38 (1953).

 Evidence of extramarital sexual activity should be admitted or excluded without regard to the gender of the parties and without regard to whether homosexual or heterosexual activity is involved. As we stated in *Smith v. Commonwealth*, 93–SC–724–MR, rendered 6/8/95, 904 S.W.2d 220, where the majority found that the defendant established sufficient connection to the charged crime to permit evidence of an extramarital lesbian affair, "evidence of marital infidelity which lacks legitimate connection to the crime charged amounts to an attack upon the defendant's character and results in prejudicial error." *Id.* at 5, 904 S.W.2d at 222. So too, evidence of the sexual behavior of the defendants which lacks legitimate connection to the crime charged is irrelevant and amounts to a smear upon the defendant's character, resulting in prejudicial error.

 In this case, evidence regarding *the relationship between Michael and Charles* and the extent of that relationship was properly admitted. Charles's offer to stipulate to a "close relationship" between Michael and Charles would be unfair to the Commonwealth. A defendant is not entitled to stipulate away the parts of the case which he does not want the jury to see. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). The relationship between Charles and Michael was at the heart of the Commonwealth's theory of a conspiracy between Charles and Michael to murder Nelda. Evidence of the love be-

tween Michael and Charles, whether that love was emotional or physical or both, was necessary to sufficiently establish a motive for Charles to conspire to murder a wife he claimed to love and for Michael to murder Charles's wife.

However, the Commonwealth presented evidence of Charles's and Michael's sexual behavior far in excess of what was relevant to prove their relationship and establish motive. The prosecutor began his opening statement by telling the jury that Charles came from a good family in McCracken County, "[b]ut Charles is different. Charles was gay." He continued by saying, "we will prove that Charles enjoyed the company of young boys." The prosecutor also stated in his opening that Charles married his second wife in order to become the foster father of a young man with whom he was sexually involved.

Charles's first wife testified that during their marriage from 1964 to 1970 (twenty years prior to Nelda's death) Charles spent time with more than one young man. She further testified to an incident where Charles prostituted her so that Charles could have sex with a young man. The prosecutor mentioned this in his opening, and in his summation he stated:

> Charles then used Donna to get a young man that he wanted to have sex with. He sold Donna's body for his own pleasure. Sold? Traded would be a better word. He allowed the young man to have sex with Donna, so that the young man would agree to have sex with him.

One of Charles's co-workers testified that while Charles was staying at her home she washed his clothes. When asked if she found anything unusual in the wash, she testified that she found women's underwear and that Charles wore women's nylon panties.

During cross-examination of Charles, the prosecutor introduced pictures of "sexual toys"[1] found under a washtub in the garden of Nelda's and Charles's home. The jury was shown three slides of the "toys" blown

up to 3½—4 feet wide by 4 feet tall. Charles did not open the door to introduction of this evidence by introducing evidence of his reputation for peacefulness and truthfulness in the community as claimed by the Commonwealth. The evidence regarding the dildos had nothing to do with truthfulness; it did not show a particular wrongful act; it didn't even show that Charles used the dildos with Michael or that Charles was homosexual. The pictures of the dildos were "not legitimate impeachment, [but] serv[ed] only to inflame the jury against" Charles. *Byrd v. Commonwealth*, Ky., 825 S.W.2d 272, 279 (1992) (Combs, J., dissenting).

During his closing argument, the prosecutor revisited the testimony about Charles's homosexuality and preference for young boys. He referred to Charles's use of dildos in his relationships and keeping a steady stream of young men coming through the house during his first marriage. Although the prosecutor stated, "being gay is no crime," he then said, "it's the way Charles Chumbler handled it that made it murder." He referred to Charles's homosexuality as "satisfying his own perverted needs" and said Charles's "desires grew stronger and stronger and kinkier and kinkier. [A witness] told you that what he really enjoyed in the sexual use was the use of these artificial items."

The Commonwealth argues, and we agree, that proof considerations are no different than if Charles was having an affair with a woman. In *Davis v. Commonwealth*, Ky., 795 S.W.2d 942 (1990), testimony about an extra-marital affair, which was connected to the charged crime, was allowed. Likewise, evidence regarding *Charles's and Michael's relationship* and regarding their "love of a lifetime" was connected to the crime charged and was relevant to establish motive.

However, testimony about and references to Charles's and Michael's relationships with third parties and evidence of the defendants' sexual habits unrelated to the crime charged was improper smear evidence irrelevant to

1. The "sexual toys" consisted of three dildos, one of which was black, a jar of Vaseline, latex gloves, and condoms.

their motive to murder Nelda. Such evidence did not tend to make the existence of a fact that is of consequence to the determination of the action more or less probable and had the effect of poisoning the atmosphere of the trial, rendering it impossible for the defendants to have had a fair trial.

## II. EVIDENCE OF COLLATERAL CRIMINAL ACTIVITY AND BAD CHARACTER

■ Charles and Michael both objected to the introduction of a variety of evidence of collateral criminal activity, bad acts, and bad character. Generally, evidence of crimes other than that charged, is not admissible to prove that an accused is a person of criminal disposition. KRE 404(b); Lawson, *Kentucky Evidence Law Handbook*, 3rd Ed., Sec. 2.25 (1993). Evidence of other crimes or wrongful acts may be introduced as an exception to the rule to show proof of motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident. KRE 404(b)(1). To be admissible under any of these exceptions, the acts must be relevant for some purpose other than to prove criminal predisposition; sufficiently probative to warrant introduction; and the probative value must outweigh the potential for undue prejudice to the accused. *Clark v. Commonwealth*, Ky., 833 S.W.2d 793, 795 (1990).

■ Evidence that Charles committed bankruptcy fraud in filling out a bankruptcy petition was introduced. Despite a motion in limine which was granted prohibiting evidence of the uncharged crime of bigamy, evidence that Michael was a bigamist was introduced. These acts had little or no bearing on the charges for which the men were being tried, yet they presented the men as being of criminal disposition. Evidence of bigamy was not necessary to show Michael's relation to a witness who was Michael's "ex-wife," as claimed by the Commonwealth. In conjunction with the other errors, we find these to be reversible errors as well.

■ Evidence that Michael stole a variety of items from Nelda's and Charles's home, including taking a table and chairs the day after Nelda and Charles left for Kentucky, was relevant evidence of the relationship between the two men and of Michael's ongoing need for money and the lengths to which he would go to obtain it. Evidence of thefts from Nelda's and Charles's home which cannot be tied to Michael are irrelevant.

■ Witnesses testified that Michael fantasized he was a character in a day-time soap opera who was portrayed as a killer for a mythical Greek society. Four witnesses testified that Michael had stated he was a "hit man" and that he talked about "icing" people and making it look like an accident. This evidence was properly allowed to show intent, identity, and the absence of accident.

■ A police detective read parts of a letter from Michael to Charles in which Michael said, "I beg that you do still have feeling for me, because I need you. Always have. I just wish it'd turn out better for us. Maybe it will when I am out in a few months or so. Please wait." When defense counsel objected, the prosecutor claimed that getting out could mean out of jail, school, or the navy and the objection was overruled. The prosecutor later said the letter indicated that Michael was probably in jail at the time he wrote it. Although it is "reversible error to call to the attention of the jury information that tends to show another crime had been committed which is independent of, and unconnected with, the one for which the accused is on trial," *Payne v. Commonwealth*, Ky., 509 S.W.2d 264, 265 (1979), the error in this case was harmless because Michael had previously elicited testimony from his mother, without objection, about his incarceration.

We do not address the additional alleged errors regarding collateral criminal activity or bad acts because they were either unpreserved or inadequately preserved for appellate review. On retrial defense counsel should object if they believe error has occurred to allow the trial court to provide appropriate relief.

## III. CIGARETTE BUTT

■ The prosecutor claimed in his opening statement that Michael Kariakis left a "virtual signature" inside the shed by leaving a cigarette butt on the floor. The butt was

not collected until a week after Nelda's death, and, according to Michael, may have been left there before or after Nelda's death. The butt was tested and found to have been smoked by a type A secretor. Michael is a type A secretor. The brand of the cigarette butt was narrowed down to twelve possibilities, one of which possibilities Michael smoked. In closing, the prosecutor multiplied the percentage of the population who are type A secretors by the percentage of the American public who smoke by the nationwide market share of the type of cigarette Michael smoked to arrive at the figure of .2 percent or 2 in 1000: "And that's the odds that Michael Kariakis was standing there, 2 in 1000 ... would've flipped down a Newport cigarette."

The calculations were completely unfounded and in error. Although there was no objection at trial, this was a "palpable error" affecting Michael's "substantial rights" resulting in "manifest injustice." RCr 10.26. The prosecutor referred to the butt as Michael's "signature" and the statistical "evidence" compounded that view. The statistical calculations rival a polygraph in their unreliability and propensity to mislead and may have convinced jurors of modest analytical ability that no one but Michael could have committed the crime.

## IV. PROSECUTORIAL MISCONDUCT

All three defendants allege a variety of prosecutorial misrepresentations and prosecutorial misconduct denied them a fair trial. Many of the alleged instances of prosecutorial misconduct are unpreserved. One of the most egregious instances of unpreserved prosecutorial misconduct came during the Commonwealth's closing argument. A defense theory of the case was that, because of the damage to Nelda and the possibility the bullet was deflected when going through a fence, the shot which killed Nelda did not come from the shed. During his closing argument, the prosecutor stated:

> You can shoot that fence all day every day for the next week and you're going to go straight through it with a .270 at 24 yards ... I didn't take the jury out to the shooting range and have a little shooting. I

went myself, so I know exactly what I'm talking about.

As we are reversing on other grounds, we need not determine whether the unpreserved allegations of prosecutorial misconduct rise to the level of palpable error required by RCr 10.26, and we will address only the preserved allegations of prosecutorial misconduct.

During questioning by the prosecutor, Charles's mother, Dorothy Chumbler, testified that she couldn't remember Perri, Charles's daughter, being at her house the evening after Nelda was killed and she didn't remember saying anything to Perri about Michael. At the ensuing bench conference, the prosecutor said he intended to impeach Mrs. Chumbler by calling Perri and that the rules of impeachment required him to ask Mrs. Chumbler if she remembered saying, "That damn Michael, I know he's involved." When asked the relevance of that statement, the prosecutor said it was relevant because "It was her opinion that Michael did this." After objection was overruled, Mrs. Chumbler denied saying, "That damn Michael, that damn Michael, I know he's involved in this."

Before the testimony of both Perri Mathis and Bill Mathis, Perri's husband, defense counsel objected to the prosecutor asking any questions regarding the witnesses' belief that Michael or Charles were involved in the murder. The trial court overruled both the objections. Perri testified, over yet another objection, "[Mrs. Chumbler] said, 'That damn Michael,' that she knew he had something to do with this." The Commonwealth now claims that although the testimony was inadmissible as an opinion of Michael's guilt, it was admissible to impeach Mrs. Chumbler's credibility regarding her testimony about the length of time Charles was gone from the house on the day of the murder and about a telephone call Charles received that day.

In *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988), it was the witness's opinion of the defendant's guilt that provided the motive for him to come forward and, in *such circumstances*, the "witness bias ... was relevant to the credibility of his testimony." Although a witness in a criminal

case may be impeached by contradictory evidence, "[s]uch evidence is not admissible for that purpose unless it pertains to a material matter." *Nugent v. Commonwealth*, Ky., 639 S.W.2d 761, 764 (1982). Mrs. Chumbler could not remember whether her granddaughter was at the house during the time about which she was testifying; this is not a material matter.

The issue of guilt or innocence is one for the jury to determine, and an opinion of a witness which intrudes on this function is not admissible, even through a route which is, at best 'back door' in nature. *Id.* at 764.

█ At trial, the Commonwealth claimed that the statement was relevant because it was Mrs. Chumbler's "opinion that Michael did this." While it may be relevant, it is not necessarily admissible. "[W]here the value of evidence for a legitimate purpose is slight and the jury's probable misuse of the evidence for an incompetent purpose is great, the evidence may be excluded altogether." *Id.* The trial court overruled objections to whether Perri and Bill Mathis could be asked their opinion of Michael's guilt before such questions were asked, and thus before any impeachment purpose was given. While we do not need to determine whether the admission of Mrs. Chumbler's opinion, through both her own and Perri Mathis's testimony, that Michael was involved was reversible error, we note for retrial that Mrs. Chumbler's opinion of Michael's guilt is of doubtful relevance.

█ Michael Kariakis also maintains that evidence of flight from Florida police officers after he was involved in a car accident in Florida was improper. However, the "flight of a person after the commission of a crime and before his arrest is . . . a circumstance to be considered" and is "some evidence of a sense of guilt." *Hamblin v. Commonwealth*, Ky., 500 S.W.2d 73 (1973). This was not error.

█ Holly and Michael both claim that the identification of their car by witnesses was error. We are aware of no cases "requiring a line-up of similar inanimate objects before identification is permitted." *Rackley*

*v. Commonwealth*, Ky., 674 S.W.2d 512 (1984). *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), both involved identifications of humans and do not require a line-up of automobiles or 100% certainty before a witness may testify. The credibility and weight of the witnesses' car identifications was properly an issue for the jury to determine.

A police detective's testimony that he told Charles's parents he was a good detective and would be fair in his investigation carried insignificant weight in this lengthy trial and caused no substantial prejudice.

█ Three photographs and corresponding slides of Nelda's body which were shown to the jury had a purpose, and they were not inadmissible merely because they were gruesome. *Copley v. Commonwealth*, Ky., 854 S.W.2d 748 (1993). There was no error in admitting the photographs.

█ Prior to trial, Charles moved to exclude certain out-of-court statements made by Michael and Holly because their statements would be inadmissible hearsay against Charles "unless and until" Holly and Michael testified. *Bruton v. U.S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In his brief, Charles claims the trial court erred in allowing testimony about statements Michael made to his mother and to one of his ex-wives. Michael told his mother Charles was going to marry a Florida schoolteacher and that Michael was going to waste her. He told his ex-wife that Nelda had a lot of money and that if they played their cards right, they would "get a house out of this." The Commonwealth's claim that *Bruton* does not apply because all the defendants testified is mistaken. On retrial, such testimony regarding Michael's statements should not be admitted until after Michael testifies because the statements implicate Charles. *Bruton* applies.

### V. FOOTPRINT EVIDENCE

█ Prior to trial, Holly moved to exclude all footprint evidence due to a missing videotape of the crime scene which was lost

while in the exclusive control of the Commonwealth. Photographs of the footprints were introduced and numerous witnesses testified regarding the placement of the footprints and who could have made the prints. Additionally, the trial court provided a missing evidence instruction which required that the jury "infer that the videotape and sound recording would be, if available, adverse to the Commonwealth and favorable to the defendants." There was no error due to the missing videotape in admitting footprint evidence.

In addition to the preserved complaint, all three defendants now claim the footprint evidence should have been excluded because the footprints were never connected to Michael, therefore the evidence was not relevant. As we are reversing on other grounds, we need not determine whether admission of the footprint evidence was palpable error. Assuming the footprint evidence will again be introduced on retrial, this issue may be raised before the trial court at that time.

## VI. HEARSAY EVIDENCE

The next issue presented by Charles involves alleged improper hearsay evidence. Many of the complained of instances are not preserved. At other times, objections were sustained and either no further relief was requested or an admonition was given and no additional relief was requested. These complaints are not adequately preserved for review, *West v. Commonwealth,* Ky., 780 S.W.2d 600 (1989), and we will not address them.

## VII. RIGHT TO PRESENT A DEFENSE

Charles argues that he was denied his right to present a defense when the trial court sustained the Commonwealth's objections and excluded certain evidence. We disagree.

■ The trial court correctly ruled that a gun shop owner was not an expert on human wounds and properly excluded his testimony regarding Nelda's bullet wound. If any of the additional complaints were error, they were harmless, as some testimony to the same effect as the excluded testimony was allowed in each instance.

## VIII. PAROLE ELIGIBILITY

■ At the sentencing phase, pursuant to a Commonwealth request to take judicial notice, the trial judge informed the jury that a sentence from 20 years to life in prison meant parole eligibility of 12 years. During his sentencing phase closing argument, the prosecutor told the jury to sentence Charles to life without parole for 25 years so he wouldn't be eligible for parole for 25 years.

Charles's case was tried under KRS 532.025 which does not allow the jury to hear information on parole eligibility. Also, KRS 532.055, which allows the Commonwealth to offer evidence regarding minimum parole eligibility, specifically states it shall not apply to sentencing hearings provided for in KRS 532.025. Whether or not this error was properly preserved for review, on retrial this case should be tried in accord with the statutory guidelines regarding parole eligibility.

## IX. IMPROPER VERDICT FORM

Charles further complains that the life without parole verdict form used at his sentencing did not allow the jury to find the aggravating circumstance without fixing the aggravated penalty. This issue was not preserved, but on retrial, the trial court should use a different verdict form.

■ Form Verdict No. 1 fixes Charles's punishment at "a term of ____ years (20 or more)." Form verdict No. 2 fixes his punishment at life. Form Verdict No. 3 states:

We, the jury, find beyond a reasonable doubt that the following aggravating circumstance exists in this case:

The Defendant committed the offense of Complicity to Murder ... for the purpose of receiving money ... or for other profit. ...

We fix the Defendant's punishment for Complicity to Murder Nelda Chumbler at confinement ... for life without benefit of ... parole until he has served a minimum of 25 years of his sentence.

The verdict form is most naturally read to indicate that, if the jury finds the aggrava-

ting circumstance beyond a reasonable doubt, they must fix Charles's punishment at LWOP for 25 years rather than merely placing him in the class eligible for LWOP for 25 years. This form is improper as it makes it difficult for the jury to find the aggravating circumstance without fixing the aggravated penalty. *Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534, 545 (1988). The final portion of the life without parole verdict form on retrial should read: "We fix the Defendant's punishment for [Complicity to Murder Nelda Chumbler] at _____ (not to exceed life without parole for 25 years)."

## X. DIRECTED VERDICT FOR HOLLY

Holly moved for a directed verdict of acquittal because "on the mental aspect or emotional state element of the case, there is no proof" and because the Commonwealth did not prove that any act of assistance took place in Kentucky. The evidence against Holly viewed in the light most favorable to the Commonwealth is that 1) Holly gave Michael money to buy the murder weapon; 2) she lied to her employer about where she was going when she took the trip to Kentucky; 3) she went with Michael to buy gloves in Paducah before the murder; 4) she was present in the car near the murder scene and assisted Michael by either driving or helping him get the car out of the snow when leaving the murder scene; 5) she lied to police about being in Paducah; and 6) she benefited from the murder when Michael received a car and cash from Charles after the murder.

■ Under KRS 500.060, Holly may be convicted under Kentucky law of an offense committed by her own conduct or the conduct of another for which she is legally accountable when either the conduct or the result which is an element of the offense occurs within the state. Because Nelda's death (the result) occurred in Kentucky, Holly's conduct outside Kentucky may be considered.

■ Although there is no clear proof, such as a confession, that Holly specifically intended to promote or facilitate Nelda's murder by providing Michael with money to buy the gun or by helping him leave the scene of the crime, the jury could reasonably infer from her actions that she did intend to promote Nelda's murder. Likewise, the jury could reasonably believe that Holly aided Michael knowing that he would kill Nelda but without intending to contribute to Nelda's murder—in which case she would be guilty of criminal facilitation.

## XI. FACILITATION INSTRUCTION FOR HOLLY

Holly tendered an instruction on criminal facilitation which was refused. A person is guilty of criminal facilitation under KRS 506.080 when,

> acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

A person is guilty of complicity and liable for the conduct of another under KRS 502.020 when, "with the intention of promoting or facilitating the commission of the offense," she "[a]ids, counsels, or attempts to aid [another] in planning or committing the offense. . . ."

■ The Commonwealth argues that, since criminal facilitation requires that the person act with knowledge that another person is committing or intends to commit a crime and since Holly never acknowledged she knew of Michael's intention to kill Nelda, Holly was not entitled to an instruction on facilitation. This contention is patently erroneous because, if there was insufficient evidence to prove Holly knowingly provided Michael means or opportunity to commit the crime, *a fortiori* there is insufficient evidence to prove she knowingly aided Michael "with the intention of promoting or facilitating" the murder, and thus Holly could not be found guilty of complicity under KRS 502.020. *Smith v. Commonwealth,* Ky., 722 S.W.2d 892 (1987), does not apply to this case because evidence sufficient to support a facilitation instruction was not present in that case.

Holly did not have to admit she knew that Michael intended to kill Nelda to be entitled to a facilitation instruction. In *Luttrell v. Commonwealth,* Ky., 554 S.W.2d 75 (1977), we noted that facilitation was a lesser-included offense of complicity. Criminal facilitation has the same elements as complicity except that the state of mind required for its facilitation is less culpable than the state of mind required for complicity. The standard we set forth in *Luttrell* to distinguish between criminal facilitation and complicity was:

[The defendant] would be guilty of criminal facilitation if he furnished [his co-defendant] with the means of committing a crime **knowing that he would use it to commit a crime but without intention to promote or contribute to its fruition.** He is guilty of the substantive offense by complicity if he furnished the means of committing the crime **intending to aid in the commission of the crime.** *Id.* at 79. (Emphasis in original.)

■ The principal difference between facilitation and complicity is the state of mind of the defendant. To be convicted of complicity, the jury must find that Holly intended that Nelda's murder occur; to be convicted of facilitation, the jury must find only that Holly knew Michael was going to commit a crime.

Holly's knowledge (necessary to convict her of facilitation) or intent (necessary to convict her of complicity) must both be inferred from Holly's conduct. A reasonable juror could have doubted Holly was guilty of murder by complicity but concluded she was guilty of the lesser offense of facilitation. Failure to provide a facilitation instruction was error, and we reverse Holly's conviction on this basis.

## XII. IMPROPER COMPLICITY INSTRUCTION

■ Holly next argues that the complicity instruction presented to the jury was improper. Although Holly tendered an alternative instruction, she did not make a specific objection to the complicity instruction given by the court and did not state specifically the

grounds on which she believed the court's complicity instruction was improper.

At the time of trial in this case, RCr 9.54(2) provided that a party could not assign error to instructions unless the party

makes specific objection to the giving or the failure to give an instruction before the court instructs the jury, stating specifically the matter to which he objects and the ground or grounds of his objection.

Thus, this issue is not adequately preserved for review and we will not address it.

## XIII. SEPARATE TRIAL

Holly Kariakis moved for a separate trial claiming that she would be "hopelessly, unfairly and unduly prejudiced" by the introduction of evidence against Michael and Charles and that she would be improperly prejudiced by having any association with the other defendants.

Much of the evidence which Holly claims inflamed the jury and prejudiced her due to her association with the other defendants poisoned the whole atmosphere of the trial. That evidence of the defendants' sexual behavior in general, sexual relations with third parties, the pictures of the "love toys," and some of the bad acts of Michael and Charles must be excluded on retrial. If Holly again moves for a separate trial, the trial court should make the determination regarding severance at that time based on the evidence that will be admitted in the next trial.

## XIV. SUPPRESSION OF EVIDENCE OBTAINED DURING SEARCH

■ Holly next argues that the statements she made during a search of her home in Florida and receipts from Kentucky transactions which were seized at that time should have been excluded because there was no probable cause for a search warrant and the execution of the warrant was unreasonable. The trial court found that the warrant was based on probable cause and the search did not exceed the parameters of the warrant. That decision is supported by substantial evidence and therefore is conclusive. RCr 9.78.

For the foregoing reasons, we reverse and remand the convictions of Charles Chumbler

and Holly and Michael Kariakis with directions that any retrial of this case shall be conducted in conformity with this opinion.

STEPHENS, C.J., and LAMBERT, LEIBSON and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion in which REYNOLDS, J., joins.

FUQUA, J., not sitting.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the Majority Opinion because the allegations of error in this case were not so pervasive or prejudicial as to deny the defendants a fundamentally fair trial or due process of law. An exhaustive review of the record in this very lengthy case indicates that reversal is not required. Although there are enumerated errors in the Majority Opinion which form the basis for reversal, the thread of alleged prosecutorial misconduct knits them together. Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the entire trial. *Dean v. Commonwealth*, Ky., 844 S.W.2d 417 (1992); *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407 (1987); *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair. *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir.1979). The conduct of the prosecutor in this case was not so prejudicial as to deprive the defendants of a fundamentally fair trial.

I

On appeal and at trial, Michael Kariakis and Chumbler both objected to testimony and evidence presented to allow the jury to draw an inference that the two had maintained a homosexual affair for a period of time. They claim that this evidence was not relevant. Relevant evidence tends to make the existence of a fact that is of consequence to the determination of the action more or less probable. KRE 401. The jury is entitled to draw an inference from the evidence to establish a motive for the killing. *See*

*Davis v. Commonwealth*, Ky., 795 S.W.2d 942 (1990).

The pair next argue that even if relevant, the evidence was prejudicial and should have been excluded. Evidence may be admitted if the danger of unfair prejudice is substantially outweighed by its probative value. KRE 403. Both men denied having homosexual involvement. Pretrial motions attempted to stipulate to the fact that the men engaged in a "strong" or "close relationship". During voir dire, counsel emphasized that they were being tried for murder and not for their lifestyle. The Commonwealth was entitled to present this evidence because it tends to explain why the murder was committed.

The ugly parts of a case may not be stipulated away. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). Prejudice is that which is unnecessary or unreasonable. *Romans v. Commonwealth*, Ky.App., 547 S.W.2d 128 (1977). Here, the evidence was not unduly prejudicial. The prosecution offered proof of homosexuality in order to establish motive for the murder. It was offered to explain the hold that Kariakis had over Chumbler and to show the length to which Chumbler was prepared to go to maintain the relationship. The trial judge did not abuse his discretion in controlling the nature and amount of evidence introduced at trial.

The homosexual relationship of the two men was used by the Commonwealth to establish motive for the murder. Chumbler's former wife and a former student testified in rebuttal that they witnessed Chumbler engaged in sexual activities with males. This testimony was not presented during the prosecution's primary presentation of the case. It was properly withheld as pertaining to a collateral matter. It was only after Chumbler denied the events that the witnesses were called to provide evidence of Chumbler's misstatements of fact. There was no error.

II

The next argument involves a series of uncharged criminal acts. This kind of evidence may be admitted if offered to prove motive, and it is not intended to prove a general criminal disposition. *Funk v. Com-*

*monwealth,* Ky., 842 S.W.2d 476 (1992); KRE 404(b). Evidence otherwise admissible is not made inadmissible merely because it tends to show the commission of an unrelated crime. *Jones v. Commonwealth,* Ky., 554 S.W.2d 363 (1977). Here the prosecution met the burden of establishing that the need for the evidence and the probative value outweighed any inflammatory effect before the allegedly improper evidence was introduced. *Jones, supra; Cf. Clark v. Commonwealth,* Ky., 833 S.W.2d 793 (1991).

Evidence that Kariakis stole numerous items from the victim's home was relevant to explain the ongoing relationship between the two men. Chumbler basically supported and provided money to Kariakis. The testimony did not show any criminal activity by Chumbler and was not error as to him. *See Drumm v. Commonwealth,* Ky., 783 S.W.2d 380 (1990). The evidence showed the ongoing need by Kariakis to utilize Chumbler as a provider of financing. The motive in this case was murder for profit. The evidence of theft was properly used to show the lengths to which Kariakis would go in order to support his lifestyle. There was no error. KRE 404(b).

Kariakis provided false information on federal forms involving the purchase of firearms. Objection to this testimony was not timely and the error was not preserved. *Bell v. Commonwealth,* Ky., 473 S.W.2d 820 (1971). Testimony and evidence were also presented which showed that Kariakis sent a letter to Chumbler where he said he loved him and asked him to wait until he was "out." The objection was overruled as getting "out" could have referred to school or the military. Additionally, Kariakis and his mother both previously provided testimony that he had been in jail at a prior time. There was no error.

Objection was raised concerning unresponsive testimony that Kariakis had previously tendered bad checks. Counsel objected and moved to strike. The court instructed the jury to disregard the testimony and no further relief was requested. All relief that was requested was provided. There was no error. *West v. Commonwealth,* Ky., 780 S.W.2d 600 (1989). Additionally, Kariakis

provided testimony concerning bad checks himself. Any error was harmless. RCr 9.24.

Kariakis appears to have fantasized that he was a character in a television show who was portrayed as a killer for some mythical secret society. Testimony was provided where he indicated to others that he was a "hit man" or that he "iced" people for a living and that he made it look like an accident. He also stated that Chumbler was to marry and that Kariakis would "waste" Chumbler's wife with an unregistered firearm. This evidence was properly allowed to show intent, identity and the absence of accident. *See Clark v. Commonwealth,* Ky., 833 S.W.2d 793 (1991).

Kariakis was married to three different women yet never obtained a legal dissolution. A motion in limine was granted which prohibited evidence of the uncharged crime of bigamy. Evidence was presented, however, that indicated that Kariakis was married to multiple women. This evidence was presented to show why Kariakis would confide in these women about his fantasy of being a killer. Although a violation of the motion in limine, it was not a significant factor in the convictions. The other evidence presented outweighed the minor prejudicial effect of this testimony. It is inconceivable that the jury found guilt because Kariakis was a bigamist based on two references during a three-week trial. Such harmless error is not cause for reversal.

### III

Michael Kariakis claims that the testimony of a police officer regarding the collection of a cigarette butt from the scene of the crime was hearsay. This was first brought into issue by questioning from the defense. It was not admitted for the purpose of proving what was said but rather as an explanation of the details of what transpired. It was not error. *See Sanborn v. Commonwealth,* Ky., 715 S.W.2d 475 (1986). A detective's statement that he told Chumbler's parents he was a good detective and would be fair in the investigation was of insignificant weight during the three-week trial, caused no substantial prejudice and is not reversible error.

Michael Kariakis seeks reversal for a statement during closing argument regarding a cigarette butt found at the scene. This issue is not preserved. A cigarette butt was found near the shed and seized as evidence. It was determined by lab analysis that it was one of 12 brands produced. Two of these brands are the same as smoked by Michael Kariakis, the only significant difference being the length of the cigarette. There was also evidence presented that Michael Kariakis seldom did anything without smoking a cigarette. Laboratory analysis determined that this cigarette had been smoked by a Type A secretor. Michael Kariakis is among the 40% of the population who have Type A blood. Type A secretors comprise 32% of the population.

Evidence was presented that 29% of the adult population smoke cigarettes. A tobacco company employee testified that over 2 percent of the cigarettes sold are the brand smoked by Michael Kariakis. Using these numbers and statistics, the prosecutor then told the jury that "It's real simple" and proceeded to explain the percentages. He ultimately arrived at a probability of 2 in 1000 that Michael Kariakis was in the shed.

The calculations were unfortunately completely unfounded and in error. This type of statistical method has been condemned in the past. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It was not a fair comment on the evidence. *Williams v. Commonwealth*, Ky., 644 S.W.2d 335 (1982). There is nothing within the record to indicate whether this analysis was provided through sheer mathematical incompetence or as a planned deceit. However, it was not evidence. It was closing argument and the jury had been admonished that the statements were not evidence. Although we deplore such tactics, there was sufficient evidence in the case so that the jury could have drawn its own inferences of guilt. There is no showing of manifest injustice. RCr 10.26. Although error, it does not mandate reversal.

A prosecutor is provided wide latitude during summation. *Lynem v. Commonwealth*, Ky., 565 S.W.2d 141 (1978). Statements must be considered within the context of the entire trial. *United States v. Young, supra.*

Chumbler described the prosecution's case as "circumstantial nothing." This invited a response and the response is not a basis for reversal. *Clayton v. Commonwealth*, Ky., 786 S.W.2d 866 (1990). There was no error.

The prosecutor drew a reasonable inference that because the gun was never found, it tended to prove murder. Holly Kariakis testified that the gun was purchased as an investment. Michael Kariakis stated the gun was purchased for Chumbler to give to his daughter as a present. Chumbler denied discussing the gun with Kariakis and denied taking the weapon from the Kariakis car. Mention of the gun was not error.

## IV

Another issue presented by Chumbler involves alleged improper hearsay evidence. One witness testified that he knew "money was a problem." An objection was sustained but no further relief was requested. *West, supra.* Other statements referring to what the victim said about financial conditions resulted in objections and admonitions to disregard the testimony. *See Charles v. Commonwealth*, Ky., 634 S.W.2d 407 (1982). There was no error.

Another witness was just about to respond in a manner which indicated how the victim felt about the title to a car she had recently purchased. Before an answer was provided an objection was sustained and no further relief was requested. There was no error. A third witness was asked about his mother's statement that she did not want Kariakis coming to their house. An objection was sustained and no further relief was requested. The witness was then asked if he learned of this decision from his mother and he responded affirmatively. On a motion to strike, the jury was admonished and no other relief was requested. There was no error. *West.*

## V

The most troubling aspect of this trial is the issue involving prosecutorial misconduct. Although all of the defendants raise numerous examples of alleged misconduct, most are

not preserved by objection as required by RCr 9.22.

During the opening statement, the prosecutor told the jury that Chumbler's 5 year-old grandson would testify that he thought the gunfire came from the shed. A competency hearing was held in the middle of the trial and it was found that testifying would be unduly detrimental to the child. The trial court, and not the prosecutor, caused the opening statement regarding the child's testimony to be a misstatement.

At a prior bond hearing, there was testimony that the child referred to both the barn and the shed as the barn. There is no indication that the prosecutor deliberately misled the jury in this regard. *See Williams v. Commonwealth*, Ky., 602 S.W.2d 148 (1980). Opening statements are not evidence and these jurors were aware of that definition. There was no error. *Kroth v. Commonwealth*, Ky., 737 S.W.2d 680 (1987). The prosecutor also stated that two video tapes of the crime scene were prepared. A review of the testimony indicates that was correct.

The defendants next argue that the prosecutor's statements during closing argument that he "proved the footprints going into the shed" were those of Michael Kariakis requires reversal. This was an overstatement of the case. There was, however, sufficient evidence introduced to allow the jury to draw an inference that these footprints were left by the killer. There was also evidence introduced which allowed the jury to draw an inference that these footprints were those of Michael Kariakis. Although an exaggeration, it was not error requiring reversal. *Williams v. Commonwealth*, Ky., 644 S.W.2d 335 (1982).

The defendants next contend that the Commonwealth purposely failed to disclose evidence required to be turned over in pre-trial discovery. It is arguable that this alleged error was waived when these matters were not brought to the attention of the trial judge. *Sargent v. Commonwealth*, Ky., 813 S.W.2d 801 (1991). Although error caused by purposeful deceit may be waived under certain circumstances, we are not required to determine that issue in this case. The alleged surprise statements were in fact disclosed prior to trial. RCr 7.24 and 7.26 are designed to give an accused a reasonable chance to defend against the charges. *Barnett v. Commonwealth*, Ky., 763 S.W.2d 119 (1988). There is nothing to indicate that the defense was not provided this opportunity. There is nothing to indicate deceit on the part of the prosecutor. There was no error.

Chumbler sought pretrial suppression of certain testimony pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The law in that case governs joint trials where statements are attributed to a defendant who does not testify. In the current case, all three defendants testified. The trial court correctly determined that there was no error.

Chumbler and Holly Kariakis also claim it was improper for the prosecutor to refer to them as liars during closing arguments. Chumbler's own testimony admitted that he told a lie. Holly Kariakis first denied being in Kentucky but evidence and identification by a motel clerk showed this was a misstatement of fact. Other examples of misstatements of fact were submitted to the jury through testimony and other evidence. A prosecutor may comment on the veracity of witnesses. *Cavins v. Commonwealth*, Ky., 272 S.W.2d 656 (1954). Reliance on *Scott v. Commonwealth*, Ky., 685 S.W.2d 184 (1984), is unfounded because Scott did not testify and place his character in issue. The characterization was not improper and was not error.

## VI

The final issue presented by Michael Kariakis is also not preserved and involves the footprint evidence. Footprints in the snow indicated that someone who appeared to have been in a hurry, parked a car in the road and went to the shed. Photographs of the scene were taken which disclosed these footprints. The emergency personnel who responded to the scene testified they were not in the area where the footprints were discovered. The integrity of the evidence itself is unquestionable. *Vanover v. Commonwealth*, Ky., 237 S.W.2d 539 (1951).

The footprints were not matched to Michael Kariakis. This alone does not preclude their introduction as evidence. *Cissell v. Commonwealth,* Ky., 419 S.W.2d 555 (1967). The jury was entitled to infer that, coupled with the description of a car linked to the scene, Michael Kariakis shot the victim while he was in the shed. The footprints are some evidence that this is true. The defense argued that they were made by an agent who was investigating the shooting. The weighing of the factual disputes is a matter for the jury. There was no error.

Review of the entire trial in context indicates that Chumbler and Michael Kariakis received a fundamentally fair trial. A perfect trial is never required. All that is necessary is a proceeding that is fundamentally fair. *Dean, supra; Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *McDonald v. Commonwealth,* Ky., 554 S.W.2d 84 (1977). None of the claimed errors require reversal, and the ultimate result upon any retrial will be the same.

I concur in reversing the conviction of Holly Kariakis but would affirm the convictions of Chumbler and Michael Kariakis.

REYNOLDS, J., concurs in this dissent.