# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2023-SC-0320-MR

CASSANDRA CARSON                                         APPELLANT

|  | ON APPEAL FROM SCOTT CIRCUIT COURT |
|---|---|
| V. | HONORABLE JEREMY MICHAEL MATTOX, JUDGE |
|  | NOS. 2019-CR-00120 & 2022-CR-00115 |

COMMONWEALTH OF KENTUCKY                       APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Cassandra "Cassie" Carson was convicted of murder and violation of a protective order in relation to the stabbing death of her ex-husband, Matt Turner. She now appeals her convictions and fifty-year sentence as a matter of right. After review, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Carson and Matt had a highly tumultuous relationship. The couple, both from Dearborn County, Indiana, met through a mutual friend and dated for only a couple of months before getting married in March 2018. They divorced in October 2018 at Matt's request. Their short-lived marriage was marred by disfunction due at least in part to Carson's substance use disorder.

In June 2018, Matt recorded a video on his cellphone of an incident at their home in Dearborn County, Indiana, during which Carson assaulted Matt. Shortly after that incident Matt drove away from the residence and reported it to Indiana State Trooper Kyle Stovall. When Tpr. Stovall encountered Matt that evening his shirt had two large rips, one across the right neck and shoulder area and one across the left chest area, he was missing his right shoe, he was limping, and he appeared to be in distress. After speaking with the officer Matt drove himself to the hospital where he was diagnosed with a moderate sprain to his left knee.

As a result of the Dearborn incident Carson entered a guilty plea to one count of domestic battery causing moderate bodily injury, a misdemeanor offense,[1] in November 2018. As part of that plea agreement, a protection order was entered against Carson wherein she was ordered to have no contact with Matt. Notwithstanding, Matt and Carson continued to see each other. After their divorce, Matt briefly lived with his friend and co-worker Josh McGuire before moving to "The Mill at Georgetown," an apartment complex in Georgetown, Kentucky, in November 2018. Carson began living with Matt at The Mill in December 2018, although her name was not on the lease.

In May 2019, Matt introduced Josh to Carson at dinner one evening. During that dinner Carson told Josh that she and Matt had divorced because

[1] Ind. Code Ann. § 35-42-2-1.3(b)(3).

of her drug use and that she became aggressive towards Matt when she was high. She further told him that Matt would restrain her when she became aggressive so that she would not harm him or herself. In early July 2019 Josh noticed that Matt had a bruise and a cut on his left cheek as well as bruises and scratches in his neck area, though he could not say what caused them. At that time, both he and Matt worked for Toyota and were seeking transfers to Texas. Josh had encouraged Matt to take the position in Texas to get away from Carson.

Around the same time, early July 2019, Matt found a meth pipe belonging to Carson in his apartment and kicked her out. In a series of text messages exchanged on July 2, 2019, Matt tried unsuccessfully to arrange for Carson to pick up her belongings and made statements such as "Not going to put up with drugs in my home[,]" and "I told you what would happen if you brought drugs into our home. You made your choice[.]" Soon after that conversation, Matt put all of Carson's things outside and two of his neighbors, James and Roxanne Gilliam, helped Carson load her belongings into their vehicle and took her to meet Nick Rodgers. Nick had known Matt since the nineties[2] and had met Carson in either 2018 or 2019. Carson was gone for about a week before Matt asked her to move back in with him at The Mill.[3]

---

[2] Matt and Nick's friendship ended on December 6, 2018, after Nick sent Matt a series of threatening text messages stating he meant to make Matt's life miserable, and that Matt needed to "leave Cassie alone." But Nick remained friends with Carson.

[3] Carson's testimony was unclear as to whether she stayed with Nick or Robert Grahl during the week she was away.

In order to transport herself and her belongings back to Matt's home Carson borrowed a Dodge Journey that belonged to Robert Grahl. Robert allowed Carson to borrow the Journey on the pretext that she was going to retrieve the rest of her belongings from Matt's home and then move in with Robert. On July 28, 2019—less than forty-eight hours before Carson killed Matt—Robert sent several text messages to Carson stating that if she was not going to move in with him and be with him then he needed his vehicle back. Carson responded, "I do want to be together your the one that don't[.]"

The following day, July 29, 2019, Carson and Matt went to The Mill's pool at 6:37 p.m. Matt's neighbor Bill Foman and his minor grandchildren were also at the pool. As evidenced by security footage from the pool, the next two hours and one-half hours passed uneventfully and at some point Bill gave Matt a shot of moonshine. Bill testified that he saw no signs of aggression from Matt that evening, and Matt did not appear to be drunk to him. The pool video ended at 8:52 p.m.

Roughly three and one-half hours later Matt recorded a video on his cell phone of an altercation between him and Carson inside his apartment. A description of his apartment will provide context for what occurred. It was a two-story apartment, and the front door on the first floor opened into one large room consisting of a living room at the front of the space and a kitchen at the back. The living room and kitchen were separated by a kitchen counter, and a gap at the end of the counter was the only path to walk between the living room and the kitchen. The back wall in the kitchen contained a sliding glass

4

door.  The total length of the first floor was approximately thirty-three feet.
Directly in front of the front door were stairs leading to the second floor.  The
second floor included two bedrooms.

The video of the altercation began at 12:20 a.m. and ended at 12:25 a.m.
on July 30.  It began with Matt standing at the entryway with the front door
open asking Carson to leave.  Carson, who was highly agitated and appeared to
be intoxicated, refused.  Large bloody scratches could be seen on Matt's neck
that Carson later acknowledged causing, and at various points in the video
Carson hit or slapped Matt.  As he was holding the front door open telling
Carson to leave, she stated one of many times that she was not leaving without
her "shit," by which she meant her belongings that were in the second-floor
spare bedroom.  Matt responded, "You don't have a choice here."  Carson said,
"Yeah I do" and then screamed "James!"; that "James" being Matt's neighbor
James Gilliam.  Over the next four minutes Matt continued to ask Carson to
leave while she continued to refuse and scream at Matt to "go get my stuff" or
to "give me my shit."  By the lead detective's count, Carson made this demand
of Matt about forty-five times throughout the duration of the video.  Matt
continued to tell her he would bring her things to her later, but he wanted her
to leave.  Four minutes and thirty-five seconds into the video Carson ripped out
the kitchen drawer where Matt kept his knives.  She then took a knife in each
hand and the following exchange occurred:

**Carson:** Go get my shit, now!

**Matt:** Please do not stab me.

5

**Carson:** Go get my shit.

**Matt:** I will beat the fuck out of—

**Carson:** Go get my shit.  Yeah, alright, I already know that—

**Matt:** We are past that point.

**Carson:** You just choked the fuck out of me.

**Matt:** Then leave, please leave.

**Carson:** Go get my shit!  Matt go get my stuff, now!  Go get my stuff, you know all that is mine.

**Matt:** Then leave I will give it to you later.

**Carson:** Go get my stuff!  Go get it and bring it down here!

**Matt:** No.

**Carson:** (screaming) Why?  Why do you want something to hold over me?  Huh?

Carson then smacked the phone out of Matt's hand.  He picked it up and they continued to go back and forth in the same manner without a resolution until the video ended at 12:25 a.m.  When the video ended Matt was standing at the foot of the stairs just inside the front door.

At 12:29 a.m. Jesse Spore, who lived in The Mill but did not know Matt or Carson, got a call from Matt's next door neighbor Amber Hobbs.  Amber told Jesse that she thought Matt was dead on the sidewalk in front of her apartment.  Matt had gone out his front door, walked over to Amber's front door and knocked on it before he fell over, broke a railing, and landed on the sidewalk.  When Jesse went to Amber's apartment, he saw Matt face down on the concrete sidewalk in front of her home in a large puddle of blood.  Matt was

6

still alive, but his breathing was very labored. Jesse called 911 at 12:32 a.m. while he attempted to render medical aid. Both law enforcement and emergency medical services arrived on scene almost immediately after Jesse's 911 call. The paramedics attended to Matt for approximately ten minutes before pronouncing him dead at 12:52 a.m.

The medical examiner that performed Matt's autopsy determined that his cause of death was a single stab wound to the base of the right side of his neck. We note here that Carson is left-handed. The knife traveled right to left and downward and was not angled frontwards or backwards. The knife went across Matt's midline and traveled through the space between his esophagus and trachea, slicing the back of his trachea in the process. The knife then went into his left pleural cavity but did not pierce his left lung. The most significant injury Matt sustained was the severing of his right jugular vein; this injury made it extremely unlikely that any amount of medical intervention would have saved his life. The medical examiner further opined that, although Matt's lung had not been punctured, the damage to his trachea caused him to breathe in his own blood and that such an injury can cause the victim to make a gurgling sound.

The eight-inch-long knife that Carson used to stab Matt was later found, covered in Matt's blood, under a blanket and a lunch box at the foot of the stairs just inside the front door. Based on the concentration of blood on the floor in that area of the house, and the absence of blood elsewhere, it was

7

undisputed that Matt was standing at the foot of the stairs by the front door when the knife went into his body.

As Matt lay dying on the sidewalk, Carson was fleeing the scene. At 12:29 a.m. she called James from her cellphone and asked if she could "hide" at his house, and he agreed. Roxanne was not home that night, as she was visiting family in another state. Carson gathered one of her suitcases and her purse from the upstairs spare bedroom and went out the back of door Matt's apartment. At 12:33 a.m., the same time the first police officer arrived on scene, Carson texted James "garage door" and he let her in. Carson asked James not to tell the police she was there. He told her that he would not lie to the police for her and that if they came looking for her, he would tell them she was there. She then left through the garage, leaving her suitcase behind. James claimed that Carson did not tell him that she had stabbed Matt at that time, and he assumed that they had been fighting again and Matt had called the police. He therefore anticipated that Matt would tell the police that Carson was at his (James) house, and they would eventually come over. When that did not occur, James went to Matt's house and gave the police a statement about Carson asking him to hide her and lie to the police.

Rather than fleeing the scene in Robert's Journey, for which law enforcement soon issued a BOLO,[4] Carson fled on foot. She went across the street from The Mill and hid in the bushes near a Kohl's department store. At

---

[4] "Be on the lookout."

8

12:45 a.m. she called Nick and asked him to pick her up. He did so at 2:17 a.m. and by 3:33 a.m. she was at his home in Gallatin County, Kentucky. At 5:22 a.m. Nick called 911, informed the operator that Carson was at his home, and asked that she be picked up. Law enforcement arrived at Nick's home shortly thereafter and transported Carson to the Georgetown Police Department without incident. At 9:16 a.m. Carson signed a waiver of her *Miranda* rights and was interviewed by lead detective[5] Lewis Crump for approximately two hours and ten minutes.

Over the course of her interview with Det. Crump, Carson told him numerous times that after Matt drank the moonshine that Bill gave him at the pool that evening, he "became evil" and that he had "choked her out" when they got back to Matt's apartment. Det. Crump was not able to validate Carson's claim that she had been choked or strangled, nor could the two medical professionals he had evaluate her at the police station. She had no visible signs of strangulation, she ate and drank throughout the interview, she had no problems speaking, she did not complain of throat pain, and she signed a form stating she did not want further medical treatment.

Carson gave many inconsistent statements during her interview, but she consistently asserted that she, who was 5'1", had not stabbed Matt, who was 6'3", but had instead thrown the knife at him from across the room and immediately ran out the back door. She told Det. Crump several versions of

_____

[5] At the time of Carson's trial, Crump was a sergeant. We will refer to him as Det. Crump, as that was his official title at the time of his investigation.

where she had been standing when she threw the knife. At various points, she told Det. Crump she was behind the countertop in the kitchen, by the sink in the kitchen, by the backdoor, and by the fridge.

Immediately following Carson's interview with Det. Crump, she was transported to a hospital to have her blood drawn pursuant to a search warrant. The results of that testing showed that she had Alprazolam (Xanax), Diazepam (Valium), Nordazepam, tetrahydrocannabinol (marijuana), methamphetamine, and amphetamine in her blood at the time it was drawn. Matt did not have any illegal substances in his system at the time of his death, but his blood alcohol content was .172. A forensic scientist with the Kentucky State Police testified that Matt's blood was found on the pants Carson wore on the night he was killed.

On August 7, 2019, eight days after Carson killed Matt, a phone conversation was recorded between Carson and Roxanne wherein Carson discussed the moments before and after the stabbing:

**Carson:** Look, he was standing right there by the front door, right?

**Roxanne:** Uh-huh.

**Carson:** I was standing over by the kitchen.

**Roxanne:** Uh-huh.

**Carson:** I wong[6] him, ran out the back door. He opened the front door and flipped over the railing [inaudible].

**Roxanne:** Huh?

---

[6] Carson sometimes used the term "wong" or "wung." It is unclear what she believed the word to mean.

**Carson:** I didn't see him, it was just, I wong it right.

**Roxanne:** 'Bout time.

**Carson:** I did.

**Roxanne:** Yeah.

**Carson:** I heard him like [makes 3 sounds], that's it. I knew I killed him, [inaudible], I knew I did. Just by the way he was gasping for air. And that's why I freaked out.

During trial, Carson's counsel conceded she was guilty of violating a protective order and that she was guilty of causing Matt's death. Counsel acknowledged the jury would find her guilty of an offense in relation to his death, but asserted she was not guilty of murder because she did not stab Matt and had instead only thrown the knife at him. In the alternative she argued she acted under extreme emotional distress (EED) because she was a victim of domestic violence, she was terrified of Matt, but she was also enraged at Matt for withholding her belongings.

James, Nick, and Carson were the only witnesses for the defense. James testified that he met Carson and Matt for the first time when Carson began living at The Mill and that he spent more time with Carson than Matt, as Carson and Roxanne were friends and James "did not care for" Matt. He testified that he had seen Carson with red marks on her neck, a busted lip, and scratches on her body; he did not provide dates for these observations. He further testified that he and Roxanne had feared something like this would happen, but they always believed Carson would be the victim, not Matt. Nick testified that Matt was very controlling towards women, that it "had to be his

11

way or no way," and that Matt "had to control every aspect of every situation." He stated that in 2019, he walked into Matt's home in Lawrenceburg, Indiana,[7] and saw that Matt had Carson pinned up against the wall and was yelling and screaming at her. Nick claimed he separated them.

Carson testified that during the evening on July 29, 2019, she and Matt had a good time at the pool, and that Matt did not instantly "become mean" after Bill gave him the shot of moonshine. Rather, he "got mean" when they got back to Matt's apartment. She claimed that when they got back Matt took the dogs out to use the bathroom while she started making Matt's lunch for the following day. She claimed she began cutting up items for a salad and boiling eggs.[8] When Matt came back, he was agitated at one of the dogs, so he pinned it down and spanked it. He then asked Carson if she was going to go with him when he transferred to Texas. She claimed that when she told him she could not go because it was too far away from her children,[9] he told her that she was not a good mother anyway and that her children would be better off without her and called her a stupid bitch.

Carson said that she then went upstairs to the spare bedroom to get away from Matt and locked the door. Although she previously told Det. Crump

---

[7] We note for clarity that Matt was not living in Lawrenceburg in 2019, as he had moved to The Mill in December 2018.

[8] The photographic evidence of the kitchen was not consistent with this claim.

[9] Carson's other ex-husband, Bobby Carson, had custody of their children and lived with them in Indiana.

12

that Matt had kicked the door in,[10] she testified at trial that he began beating on the door with his fist and then opened it with a "painter's key." She claimed Matt then jerked her off the floor by her wrists and put her in a chokehold until she passed out. When she regained consciousness, she said "something smart" to Matt that made him punch her in the back of the head nine to ten times. They both then went downstairs at which point Matt began recording the video that has been previously described. She asserted that she was terrified of Matt and got the kitchen knives "for protection." After the video ended, they continued to argue for a for a few minutes and Carson threw a knife at Matt while she was standing by the kitchen counter, roughly seventeen and one-half feet away from the front door. She was adamant that as soon as she threw the knife, she ran out the back door and did not see the knife go in Matt's body. She further asserted that she asked James to tell the police she was not there because she thought Matt had called the police on her for violating the Indiana protective order, and that she did not know Matt was dead until she got to Nick's house hours later.

Following an eight-day trial with over thirty witnesses and 109 exhibits, the jury was instructed on intentional and wanton murder, first-degree manslaughter, second-degree manslaughter, and reckless homicide in relation to Matt's death. The murder instruction included an instruction for the partial

---

[10] Det. Crump described the door as a hollow core door that had sustained no damage based on photographic evidence. The Mill's property manager likewise testified that no doors in the apartment had to be replaced following Matt's death.

defense of EED. The jury found Carson guilty of murder and violating a protective order. It recommended, and the trial court imposed, a sentence of fifty years for murder and one year for violation of the protective order to run concurrently for a total of fifty years.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. Gruesome Photographs

Carson's first argues the trial court erred by allowing the admission of ten photographs of Matt's body following his death, and further asserts that the trial court erred by allowing the jury to retain copies of those photographs in individual binders during the trial.

Carson filed a motion in limine seeking to exclude: "All photographs of the decedent at the crime scene[,]" "All photographs [of] any injuries on the decedent as a result of the allegations in the above indictment[,]" and "All photographs of the decedent taken as part of a medical examination (autopsy)." She argued that the facts the Commonwealth intended to prove through admission of the photographs could be proven by other, less prejudicial means. Therefore, the photographs had a low probative value that was substantially outweighed by the risk of undue prejudice that they posed, and they accordingly failed to satisfy KRE[11] 403's balancing test. After a hearing on the motion, the trial court denied the defense's blanket request to exclude all

---

[11] Kentucky Rule of Evidence.

14

photographs of Matt's body. The court agreed that there is a point at which such photos can become excessive and cumulative but noted that the Commonwealth was entitled to prove its case. The court explained that the Commonwealth's theory of the case was that Matt was stabbed in the neck, causing his death, and to prove that theory it would need to show his wounds and discuss his autopsy. The court further noted that the Commonwealth had agreed to limit the number of photographs of Matt's body to no more than ten.

Less than one month later, during another pre-trial hearing, the Commonwealth discussed as a matter of housekeeping that it had prepared binders for the jury to use. The court agreed to their use, but directed the Commonwealth to provide the jury with each exhibit after it was admitted rather than passing out binders that already have each exhibit in them. The court explained to defense counsel that using jury binders was something it had done in previous trials and that it felt their use would be appropriate in this case, given the large volume of exhibits it was anticipating. The defense agreed with the court that the jury should only see the exhibits after they have been admitted into evidence and did not object to using binders.

Two months later the trial court entered an Evidentiary Order. The court ruled that the gruesome photographs which the defense sought to suppress would be admissible "as they have probative value needed for the Commonwealth to prove their case and they are necessary to help the jury understand the case." It further ordered that the gruesome photographs "shall be limited to ten (10) photographs so as not just to shock or inflame the jury[.]"

During the direct examination of the Commonwealth's first witness, Tpr. Stovall, and after the Commonwealth had distributed a couple of exhibits to be placed in the jury's binders, defense counsel asked to approach the bench. It argued that giving each juror an individual copy of every paper exhibit was "not the proper way to do it." The trial court said it was going to allow their use, that the jury was not going to take their individual binders into deliberations or out of the courtroom, and that if an exhibit was not admitted it would not go into the binders. It further directed the Commonwealth not to interact directly with the jurors and to instead allow the bailiffs to distribute the copies.

After Tpr. Stovall's testimony concluded, and prior to the admission of any gruesome photographs, the court asked the parties to approach. It *sua sponte* ruled that the ten photographs that had been designated as gruesome could be published to the jury but would not be placed in the binders. The court explained: "I don't want them to have it in the binder because I think we run the risk of someone sitting there and staring. . . at something disgusting for an hour." Instead the Commonwealth was directed to have the bailiffs pass around one copy of the photographs that was then to be returned. Immediately after that ruling, the court admonished the jury that the binders were solely for reference and that they would not be permitted to take them into deliberations. It instructed the jury that all notes should accordingly be taken in their notebooks and not their binders.

16

Based on the foregoing, Carson's second argument can be disposed of directly. The trial court could not have erred by allowing the jurors to keep the ten photographs in their binders because it did not allow them to do so.[12]

As for her other argument, this Court reviews a trial court's admission of gruesome photographs for abuse of discretion. *See, e.g., Adkins v. Commonwealth*, 96 S.W.3d 779, 795 (Ky. 2003). A trial court abuses its discretion when its ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). It is well-established that "[b]ecause the Commonwealth must prove the *corpus delicti*, photographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect." *Adkins*, 96 S.W.3d at 794 (citing KRE 403). Accordingly, a photograph is not "inadmissible simply because it is gruesome and the crime is heinous." *Adkins*, 96 S.W.3d at 794.

Notwithstanding, gruesome photographs are not automatically admissible, and a trial court must conduct a KRE 403 balancing test prior to admitting such evidence. *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015).

---

[12] Carson's appellant brief raises the issue of a juror becoming nauseous during the trial and implies that it was due to the gruesome photographs, but that does not appear to be the case. The first time the record reflects the juror having an issue was during the Commonwealth's direct examination of Tpr. Stovall, but none of the gruesome photographs were admitted or discussed during his testimony. The second time the juror was mentioned was during the medical examiner's testimony, but it was during a discussion of the difference between veins and arteries and how far blood could be expected to spurt out of each if severed.

17

KRE 403 directs that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

Before this Court, Carson has not made a specific objection against any one of the ten photographs admitted at trial and instead appears to argue that the trial court reversibly erred by not granting the defense's blanket motion to suppress all of the photographs. We disagree.

While it is always upsetting to see the deceased body of another human being, the photographs introduced in this case were relatively mild. Matt's body had not sustained any decomposition or mutilation apart from the one stab wound, and all of the photographs were of the outside of his body. Moreover, each of the admitted photographs had a probative value that was sufficiently explained during the Commonwealth's case in chief. The photographs were used to demonstrate the condition of Matt's body when he was pronounced dead at the scene and when he arrived at the medical examiner's office; the location, length, and trajectory of his stab wound; and some of the other scratches and abrasions that were present on his upper torso and face. Only two of the photographs depicted his body prior to his blood being washed off, and the number of photographs was limited to ten. The photographs' individual probative values were therefore not diminished in the manner cautioned against by *Hall*. 468 S.W.3d at 824 ("When there is already overwhelming evidence tending to prove a particular fact, any additional

18

evidence introduced to prove the same fact necessarily has lower probative worth, regardless of how much persuasive force it might otherwise have by itself."). Nor were the photographs unduly prejudicial. The admission of the photographs was accordingly not an abuse of discretion, and we affirm.

## B. Evidence of Carson's Infidelity

Carson next alleges that the trial court erred by admitting: (1) testimony about a threesome that Carson had with James and Roxanne Gilliam; (2) a recorded phone call between Carson and James' mother, Delilah Peek; (3) a recorded phone call between Carson and Robert Grahl; and (4) text messages between Carson and Robert.

Prior to trial, the Commonwealth gave notice pursuant to KRE 404(c) of its intent to introduce evidence of Carson's non-platonic relationships with other men. It asserted that if those men were called as witnesses, the jury needed to know the nature of Carson's relationship with them in order to properly gauge their credibility, particularly if they helped her flee the scene. The evidence was also intended to refute Carson's claims that she loved Matt and would never do anything to intentionally harm him and, as Carson was seeking an EED instruction, her mental state would be a focal point of the case. The Commonwealth asserted that her communications with and about other men both before and after the murder were highly probative of her mental state. Defense counsel objected to any such evidence, arguing that it was both irrelevant and improper KRE 404(b) evidence that did not satisfy any exception to that rule. It argued that the Commonwealth wanted to present the

19

evidence solely to prejudice the jury against Carson. The trial court ruled that any communications between Carson and other men related to her fleeing the scene after the murder would be admissible, but it reserved ruling on communications solely meant to demonstrate her romantic involvement with other men. It directed the Commonwealth to request rulings on those pieces of evidence as they arose at trial.

Before this Court, Carson asserts that any evidence of her sexual behavior with or professed love for other men was impermissible KRE 404(b) evidence, that was admitted solely to prejudice the jury against her. In the alternative, she argues the evidence was inadmissible under the general rules of relevancy—KRE 401 and KRE 402—and KRE 403's balancing test. She argues that the trial court therefore abused its discretion by admitting the evidence and that she is entitled to a new trial. We disagree.

### 1) *Evidence Presented at Trial*

During the Commonwealth's opening statement, it only mentioned James to discuss that Carson had asked him to hide her from police after the murder and referred to him as Carson's "close personal friend." Similarly, it only discussed Robert to explain that he was the individual that Carson had borrowed a vehicle from to move back to Matt's apartment and referred to him as a "male friend."

Prior to the Commonwealth calling James as a witness, it informed the court that James had a threesome with Carson and his wife on one occasion. As his credibility was at issue, and because he was the first person Carson

20

went to for help after the murder, the Commonwealth intended to ask him about the nature of his relationship with Carson. The defense noted its previous objections to evidence of Carson's involvement with other men and reiterated that it believed it was solely improper evidence meant to impugn her character. The trial court allowed the evidence, finding that the evidence helped explain Carson's course of conduct on the night of the murder in going to James' house first, it was important to the jury's understanding of the evidence, and it did not believe the evidence would "shock" the jury.

During his direct examination by the Commonwealth James testified that he had a threesome with his wife and Carson on one occasion one to two months before the murder and, to James' knowledge, Matt did not know about it. James stated he did not have an emotional attachment to Carson and did not believe she had one for him.

Det. Crump was called twice in the Commonwealth's case in chief, but he did not discuss Carson's and the Gilliams' sexual encounter until he was recalled.[13] Much of Det. Crump's testimony on recall focused on the inconsistencies between Carson's statements during her interview with him and the evidence he collected in his investigation. Prior to discussing the inconsistencies between Carson's interview and the statements she made in

---

[13] When Det. Crump was first called the Commonwealth asked if James was just a random neighbor or if Carson had some kind of relationship or friendship with him. Det. Crump responded, "There was a relationship that the defendant had with James and Roxanne Gilliam." He did not state it was sexual in nature.

the August 7, 2019, call with Roxanne[14] Det. Crump explained that "James and Roxanne Gilliam were friends of the defendant, and they were also in a sexual relationship with the defendant at one time."

Later in Det. Crump's recall testimony, the Commonwealth approached the bench and noted the court's previous direction to request a ruling on any evidence that may reflect Carson's relationships with other men; it sought to introduce two recorded phone calls to that effect. The Commonwealth asserted the calls were admissible because they included statements against Carson's interest, included admissions of guilt, and contradicted statements she made to Det. Crump to which he would later testify. The court agreed the calls should be admitted, and defense counsel did not object.

A few hours later, the Commonwealth asked to publish and introduce the first call, which was between Carson and James' mother Delilah Peek and occurred after Matt's death. The trial court asked if defense counsel had any objection and counsel replied, "No, your honor."

**Delilah:** You probably wish you would have met [James] before Roxanne did, huh?

**Carson:** Yeah. I would've had it made. He was a sweetie. He really is.

**Delilah:** Yeah, he's taken good care of her for the last twelve, fifteen years whatever it's been.

**Carson:** To be honest with you that's the main reason why I kept coming back.

---

[14] That conversation is quoted in Section I of this Opinion.

22

**Delilah:** Oh, really?  To Kentucky?  Oh really?  Let me ask you a question, I know already the answer, are you in love with [James]?

**Carson:** I am.

**Delilah:** Are you?

**Carson:** Yeah.

After playing the call Det. Crump testified that the statements Carson made on the call were inconsistent with her statements to him in her interview because in her interview she acted as though she did not know who James was and otherwise tried to minimize her relationship with James.  James later testified as the defense's first witness and again stated during direct examination that he and his wife had sex with Carson on one occasion.  He testified during cross-examination that he was unaware of any of Carson's statements to his mother about being in love with him or coming to Kentucky just to see him.

Later in Det. Crump's recall testimony the Commonwealth moved to admit the second call.  This call was between Carson and Robert and was recorded eleven days after Matt died.  Prior to its admission, the trial court asked defense counsel if there was an objection and he responded, "No objection."

**Carson:** I'll marry you tomorrow, I swear to God, tomorrow. I swear.  [Inaudible].

**Robert:** What?

**Carson:** We're going to Las Vegas, guaranteed.  I love you.  Yeah if you can get me out of here, get me out of here.

**Robert:** I'm trying to help.  [Inaudible].

**Carson:** Huh?

23

**Robert:** Speak to your lawyer.

**Carson:** You don't have to talk to my lawyer, if you've got the money just bring it up.

**Robert:** Ten grand?

**Carson:** Yeah.

**Robert:** What do I get for ten grand?

**Carson:** You'll get it back. You'll get it back at the end. No, you'll get that back. [inaudible]. It comes back to you.

**Robert:** Okay, what about all the court fees and all that shit?

**Carson:** I mean they'll fuckin', they'll make you pay my court fees and stuff but [inaudible]. You're lucky I did it here, 'cause if I was in Indiana I'd be fucked. But if you was to come here and pay it out they'd let me right out with you. I love you. I've been dreaming of that bed dude for real. Been dreaming about [inaudible].

**Robert:** Am I? That could've been your neck dude.

**Carson:** I don't want to kill you (laughs).

**Robert:** I know. [inaudible] he wouldn't be shit to you [inaudible].

**Carson:** You make my heart melt.

**Robert:** Just throw it down on the ground.

**Carson:** You make my heart melt. I really do love you.

**Robert:** I love you more.

Det. Crump testified that Carson's statement that she did not want to kill Robert implied that she did want to kill Matt, and that this was inconsistent with her statement to Det. Crump that she did not want to kill Matt. The Commonwealth then moved to admit the following text message exchange

24

between Carson and Robert that took place on July 28, 2019, prior to Matt's death:[15]

> **Robert:** I wish i knew why you have to do this but it is what it is
>
> **Robert:** Cassie if your not going to move in and not going to be with me then I need my journey back I can believe you push my love to the side I hope one day you will u will lo
>
> **Robert:** Cassie God dam talk to me if you don't want to be together then give me the
>
> **Robert:** Cassie this is getting crazy why aren't u talking to me
>
> **Carson:** I do want to be together your the one that don't
>
> **Robert:** How can we be together if your never around Cassie give a break i always want to be together always your the one that can't quit running around god know what your doing and who your with its been almost a week and u haven't came home one time now what are you talking about.

The defense objected to admitting the text messages, and in response the Commonwealth argued that Carson's statement to Robert that she wanted to be with him was inconsistent with her claims to Crump that Matt was the love of her life and her soulmate to try to convince him that she would never intentionally harm him. Moreover, the texts were exchanged less than forty-eight hours before Carson killed Matt and demonstrated that the man that lent her the vehicle to get to Kentucky was asking her to be in a relationship with him and she agreed. The trial court ruled that the texts were admissible

---

[15] The text messages are presented verbatim, including grammatical and spelling errors.

because in her interview with Det. Crump Carson stated she loved Matt and would never hurt him, but in the texts she told another man that she wanted to be with him. From that, the jury could infer that she was being dishonest with Det. Crump. Prior to the admission of the text messages the court asked if the defense had an objection, to which it responded it had no objection "except as noted."

During the Commonwealth's cross-examination of Carson, she testified that what she told Delilah was not true, and that she came back to Kentucky to be with Matt. Over defense objection, the Commonwealth played a portion of Carson's interview with Det. Crump[16] wherein she denied ever "fooling around" with James or having a threesome with the Gilliams. The trial court allowed the evidence based on its reasoning that the fact she lied to Det. Crump went to her credibility and that her credibility was crucial to the overall disposition of the case. Carson's explanations for the inconsistencies in her interview with Det. Crump included not remembering most of the interview, that the threesome was "nothing to brag about," and that "it only happened once."

The Commonwealth also cross-examined Carson on the nature of her relationship with Robert, who Carson testified was "a friend." When prompted, Carson acknowledged that she told Det. Crump that she loved Matt with all her heart, that Matt was the man of her dreams, and that Matt was her soulmate. The Commonwealth asked, if that were true, why she sent a message to Robert

---

[16] This recording was not entered into evidence.

stating that she wanted to be with him. She responded that during the week that Matt kicked her out in early July 2019 "I tried to find me another place to go, yes. So that explains [the texts between her and Robert]." She acknowledged telling Robert that she was borrowing the Journey in order to get the rest of her things from Matt's house, i.e., that she did not tell Robert she was actually using the vehicle to move back in with Matt. The Commonwealth's last line of cross-examination concerned the phone call between Carson and Grahl. Based on the call the Commonwealth asked her the rhetorical question: "But you didn't want to kill Robert Grahl, did you?" and then ended its questioning.

The defense's closing argument asserted that any evidence of Carson expressing love towards other men was meant as platonic love. Counsel acknowledged the one-time sexual encounter with the Gilliams occurred but argued that relationships are not perfect and significant others sometimes cheat on one another. Finally, it alleged that because the Commonwealth did not have a strong case against Carson, it was "flinging mud" on her in hopes that the jury would convict her solely because it disliked her. The Commonwealth began its closing argument by playing the phone call between Robert and Carson wherein she said she did not want to kill Robert. It argued that this implied she wanted to kill Matt and, further, the call took place very soon after she killed Matt, but she did not seem to have any regret or sadness about it. It further argued that her claims that her "love" for James and Robert was platonic was unsupported by the evidence. Finally, it noted that Carson's

27

statements to Delilah about James directly contradicted the defense's assertion that the reason Carson frequently went to the Gilliams' home was to get away from Matt's mistreatment of her.

### 2) *Carson's arguments against the recorded phone calls were waived.*

Preliminarily, we hold that Carson has waived her right to argue on appeal that the admission of the two phone calls was error. During Det. Crump's testimony the Commonwealth, in the presence of defense counsel, informed the trial court that it intended to introduce two recorded phone calls demonstrating Carson's romantic involvement with other men. The defense did not object at the time the Commonwealth stated its intention to introduce those phone calls, and it explicitly stated it had "no objection" prior to the subsequent introduction of each call.

In *Howard v. Commonwealth*, a child sex abuse case, this Court held a similar sequence of events constituted waiver of the ability to challenge an alleged error on appeal. 595 S.W.3d 462 (Ky. 2020). In that case, the Commonwealth filed a one sentence motion to have two of the juvenile victims, W.J. and M.F., testify in chambers outside of the presence of the defendant. *Id.* at 472. Defense counsel objected, and the trial court directed the Commonwealth to provide legal authority that would allow the victims to testify in that manner. *Id.* at 473.

28

On the same day, the Commonwealth filed an amended motion citing to KRS 421.350,[17] but the trial court did not rule on that motion until one week later immediately before W.J. was called to testify. *Id.* The Commonwealth asked that W.J.'s testimony be taken in chambers and "[d]efense counsel clearly stated that she had no objection to proceeding in this fashion." *Id.* Similarly, prior to M.F.'s testimony, the trial court "asked defense counsel, 'Are you on board with doing this the way we did the previous witness?'" and "[d]efense counsel responded, 'Yes. I agree.'" *Id.* On appeal, Howard asked this Court to review the trial court's ruling to allow W.J. and M.F. to testify in chambers for palpable error and we declined, holding:

> This Court. . .has repeatedly recognized the difference between unpreserved errors and waived, or forfeited, errors.
>
> "When, as here, a party not only forfeits an error by failing to object to the admission of evidence, but specifically waives any objection, the party cannot complain on appeal that the court erroneously admitted that evidence." *Tackett v. Commonwealth*, 445 S.W.3d 20, 29 (Ky. 2014). Although the issue Howard raises is not one of admission of evidence but rather one of the manner in which evidence was admitted, the same logic applies. "[I]nvited errors that amount to a waiver, i.e., invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011) (citing *United States v. Perez*, 116 F.3d 840 (9th Cir. 1997)). We hold that any alleged error as to this issue was waived, rather than unpreserved, and therefore we decline to review it.

*Id.* at 475.

---

[17] KRS 421.350 provides the procedure by which a child victim may testify outside of the presence of a defendant.

Here, defense counsel was undoubtedly aware of the contents of the recorded phone calls: they were provided in discovery and the Commonwealth stated what they contained prior to seeking their admission. Despite that knowledge and forewarning, defense counsel explicitly stated it had no objection to the admission of the phone calls at the time the Commonwealth sought to admit them. The admission of the phone calls is therefore a waived error rather than an unpreserved error and we decline to address it. *Id. See also Tackett*, 445 S.W.3d at 29 (holding the defendant waived his ability to challenge the admission a physician's report that identified him as the perpetrator because defense counsel stated it had "no objection" to the admission of the report).

### 3) *Applicable Law*

All relevant evidence is admissible unless otherwise provided by law, and evidence that is not relevant is inadmissible. KRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Relevant evidence may still be excluded if "its probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403.

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

30

KRE 404(b)(1).

Here, the evidence Carson challenges—her sexual activity with the Gilliams and her statement to Robert that she wanted to be together—can both be classified as evidence of her infidelity. It is well established that "evidence of marital infidelity[18] which lacks legitimate connection to the crime charged amounts to an attack upon the defendant's character and results in prejudicial error." *Smith v. Commonwealth*, 904 S.W.2d 220, 222 (Ky. 1995). Stated differently, evidence of infidelity that has a legitimate connection to the crime charged does not result in prejudicial error, assuming the applicable rules of evidence have been satisfied.

In *Springer v. Commonwealth*, this Court held that KRE 404(b) has no application to evidence of this nature. 998 S.W.2d 439, 449 (Ky. 1999).[19] We reasoned that KRE 404(b) "proscribes the introduction of evidence tending to prove a particular character trait 'in order to show action in conformity therewith[,]'" and that "[e]vidence of immorality would not tend to prove a

---

[18] We acknowledge that Matt and Carson were divorced but can see no reason under these facts to distinguish between marital infidelity and dating infidelity.

[19] In *Springer*, this Court held: (1) that evidence of the defendant's extra-marital affair was admissible to prove the Commonwealth's theory that part of her motive in killing her husband was to free herself to pursue other romantic interests; (2) that evidence of the defendant's willingness to engage in a threesome with her husband and another man was admissible to rebut the defendant's claim that her husband tried to force her to have said threesome; (3) that evidence of her actual participation in a threesome with her husband and another woman was admissible to rebut her claim that her husband sexually abused her by forcing her to participate; and (4) that testimony concerning the contents of a brief case, including "marital aids" and a sex tape of the defendant and her husband, were admissible to rebut her argument that the contents of the brief case proved her battered woman defense. *Id.* at 449-51.

31

propensity or disposition to commit homicide." 998 S.W.2d at 449. Accordingly, rather than address the admission of such evidence under KRE 404(b), "the evidence must be tested by the general rule of relevancy[.]" *Id.* The Court further noted that "[a] 'fact that is of consequence to the determination of the action'" pursuant to KRE 401 "includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense." *Id.*

That said, the Commonwealth may not go beyond what is necessary to prove that a given romantic relationship exists and to establish its connection to the Commonwealth's case. That was the holding of *Chumbler v. Commonwealth*, 905 S.W.2d 488 (Ky. 1995), upon which Carson primarily relies. In *Chumbler*, the Commonwealth was permitted to introduce evidence that Chumbler was in a homosexual relationship with one of his co-defendants because it was necessary to prove the Commonwealth's theory of the motive Chumbler and his co-defendant had for murdering Chumbler's wife. *Id.* at 492-93. The Court noted that Chumbler's offer to stipulate to a "close relationship" with his co-defendant "would be unfair to the Commonwealth" and that "[a] defendant is not entitled to stipulate away the parts of the case which he does not want the jury to see." *Id.* at 492.

However, *Chumbler* went on to hold that the "Commonwealth presented evidence of [Chumbler and his co-defendant's] sexual behavior far in excess of what was relevant to prove their relationship and establish motive." *Id.* at 493. This excess included the Commonwealth's opening statement that Chumbler

32

"was gay" and that he "enjoyed the company of little boys"; evidence that

Chumbler prostituted his wife so that he could have "sex with a young man";

photographs and testimony about "sexual toys"; evidence that Chumbler wore

women's underwear and nylon pantyhose; and the Commonwealth's allegation

in closing that Chumbler kept "a steady stream of young men coming through

the house during his first marriage." *Id.* It was this evidence that the

*Chumbler* Court held was not relevant and "had the effect of poisoning the

atmosphere of the entire trial, rendering it impossible for the defendants to

have a fair trial." *Id.* at 494. We cannot conclude that the evidence concerning

Carson's involvement with the Gilliams or Robert was stretched to such an

extreme.

**4)  *Evidence of the Threesome with the Gilliams***

Defense counsel properly objected to evidence of Carson having a

threesome with the Gilliams being admitted. This Court reviews a trial court's

ruling to admit evidence for abuse of discretion. *See, e.g.*, *Meece v.*

*Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011). We must accordingly uphold

the trial court's rulings to admit the challenged evidence unless we can

conclude it was "arbitrary, unreasonable, unfair, or unsupported by sound

legal principles" to find that the challenged evidence was relevant and that its

probative value was not substantially outweighed by the danger of undue

prejudice. *English*, 993 S.W.2d at 945; KRE 401; KRE 403.

We hold that the trial court did not abuse its discretion in finding this

evidence to be relevant. Carson's actions following Matt's death can be

33

reasonably described as flight from the crime scene. "Kentucky law has held that evidence of a defendant's flight or resistance to arrest is admissible to show a guilty conscience because flight is always some evidence of a sense of guilt." *Doneghy v. Commonwealth*, 410 S.W.3d 95, 105 (Ky. 2013) (internal quotation marks omitted). Add to that the fact that Carson claimed her actions were the result of EED, and it is beyond dispute that the Commonwealth was entitled to present evidence of Carson's flight as proof of her state of mind.

The first step in that flight was to seek help from James. She first asked if she could "hide" in James' home, and then asked him to lie to the police for her by telling them she was not there. After he refused, she fled across the street on foot and hid in bushes until Nick picked her up. While it is true that James did not help Carson hide from police, he corroborated key pieces of her defense at trial. Carson maintained that she did not know Matt was dead until she got to Nick's house, and that she only fled and asked to be hidden from police because she assumed Matt had called them on her for violating the protective order. James testified that Carson did not tell him Matt was dead or that she had stabbed him when she asked him to hide her and that he assumed Matt had called the police after he and Carson had gotten into yet another fight.

In addition, the defense focused on proving that Matt "was no teddy bear" and became violent towards Carson when he drank to support her claim of EED. James testified that Carson frequently came to his house to get away from Matt's mistreatment and that he did not like Matt because of the way he

34

treated Carson. Moreover, James testified to seeing several injuries on Carson with the implication being that Matt inflicted them. And he testified that he always suspected that if something like this were to happen, Carson would have been the victim.

James was a crucial witness in enabling the Commonwealth to explain Carson's flight from the scene and, in turn, her mental state. He also gave testimony that was favorable to Carson's defense. The Commonwealth was therefore entitled to present evidence demonstrating the "full picture" of the nature of his relationship with Carson so that the jury could adequately assess his credibility. "Assuredly, witness credibility is always a probative issue in any case. The right to impeach a witness to show bias or prejudice is fundamental to a fair trial." *Holt v. Commonwealth*, 250 S.W.3d 647, 653 (Ky. 2008). However, "[t]here must exist some practical connection between the evidence sought to be introduced and the alleged implication of bias[,]" and "the evidence should have some proclivity to demonstrate impropriety or partiality beyond abject speculation." *Id.* (holding that a witness' mere participation in a pretrial diversion program was an insufficient basis for impeachment to show bias in favor of the Commonwealth). Certainly, there is a practical connection between having an intimate relationship with someone and being biased in their favor that goes beyond mere speculation. We accordingly hold that evidence of Carson's threesome was accordingly relevant, and its probative value was not substantially outweighed by the risk of undue prejudice and affirm.

35

### 5) *Text Messages Between Carson and Robert*

Defense counsel objected to the admission of the text messages between Carson and Robert. This Court may therefore reverse if we conclude that the trial court's finding that the evidence was relevant and that its probative value was not substantially outweighed by the danger of undue prejudice was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles[.]" KRE 401; KRE 403; *Meece*, 348 S.W.3d at 645; *English*, 993 S.W.2d at 945.

However, we agree with the trial court's finding that the text messages were relevant to rebut Carson's claims to Det. Crump that she would never do anything to harm Matt because she loved him. Less than forty-eight hours before Matt's death Carson told Robert that she wanted "to be together." As the trial court noted, Carson's credibility was critical to the disposition of the trial, and one could infer from those texts that she was not being honest with Det. Crump. One could also conclude from the text messages that Carson had not been honest with Robert either: the clear implication from those messages is that Carson told Robert she was going to return to Indiana to be with him after she gathered the rest of her possessions from Matt's home. As Carson acknowledged in her testimony, that was not true.

In addition, evidence that Carson was in possession of Robert's vehicle was important to the Commonwealth's proof concerning Carson's state of mind. Because Carson was in possession of the vehicle, she had a means to leave the scene on her own. But, instead, she hid for over an hour in bushes across the street until Nick picked her up. The Commonwealth argued that

36

this was because she knew the police would be looking for that vehicle, which in turn was proof, however marginal, that she was thinking clearly and strategically and had not been overcome by EED. We can discern no reason why the jury should not be entitled to know that Carson was in possession of that vehicle, and how she came to have it. That evidence would in turn necessitate context regarding the relationship between Carson and the individual that allowed her to borrow it. The text messages clearly had relevance in this case and there is no basis to conclude that the messages' probative value was substantially outweighed by a risk of undue prejudice. We affirm.

## C. The Dearborn Incident

Carson's next assertions of error concern evidence of the Dearborn, Indiana, incident which resulted in a protective order being issued against her. She argues the trial court erred by admitting the video Matt recorded during the incident and by admitting Matt's unredacted medical records from the incident.

Before trial, the Commonwealth filed KRE 404(c) notice of its intent to introduce evidence of the June 4, 2018, Dearborn incident.[20] It argued the incident was a prior, similar act of violence against the same victim and was

---

[20] The Commonwealth also sought to introduce three other 2018 Indiana incidents involving law enforcement. The trial court's Evidentiary Order excluded the three other incidents upon finding they dealt with "either issues unrelated to this alleged criminal conduct or with persons other than the victim, an/or the prejudicial value substantially outweighs any probative value[.]"

therefore admissible under KRE 404(b)(1) as proof of Carson's motive, intent, plan, and lack of mistake and was further relevant to rebut her assertions that, prior to his death, Matt had attacked her and she was terrified of him. The defense filed a motion in limine against the evidence, arguing that it was not substantially similar to the incident that resulted in Matt's death; that it could not be used to show Carson's motive, intent, plan, or lack of mistake; and that it would be unduly prejudicial. The trial court ruled to admit the evidence, finding it involved similar criminal conduct by Carson against the same victim, and that it was the basis for the charge of violating a protective order. It further found that the evidence went directly to the Commonwealth's theory of the case and was meant to prove Carson's intent and motive, and that the evidence's probative value far outweighed any prejudice it would cause.

The Commonwealth played the Dearborn incident video in its opening statement. It explained that Matt reported the injury to Tpr. Stovall and then drove himself to the hospital. It then displayed a page from Matt's medical records wherein he indicated he wanted help out of fear or abuse in his relationship. The defense objected on the basis that they were getting deep into a charge she was not on trial for. The trial court noted that the medical records were self-authenticating and that it had previously ruled that evidence of the Dearborn incident was admissible under KRE 404(b)(1) and allowed the Commonwealth to continue. The Commonwealth then displayed a page from Matt's medical records wherein he reported that his wife had tried to stop him

from leaving, stepped on his shoe, and cause him to fall on his knee. It stated that a protective order was entered against Carson following the incident.

All of the exhibits related to the Dearborn incident were admitted through Tpr. Stovall. Those exhibits were the video, six photographs, Matt's medical records, and the protective order.

The roughly two-minute-long video took place at the home Matt and Carson shared in Indiana.[21] It begins with Matt yelling "Cassie, please let go of my crotch!" He then walked away from her through the kitchen and out the back door. As he was walking away Carson said, "Yeah, you better run, run out the back door you bitch." While in the kitchen Matt picked something up, causing Carson to scream, "That's my son's, put it down! Put it down!" Matt responded, "Here" and then continued to walk away from her. Before Matt could reach the back door get outside, he screamed "Ouch, fuck, my neck! Son of a!" Carson laughed at him mockingly and said "Bye!" as he exited the house. She then followed him towards his car, and he said, "quit hurting me!" Carson responded, "I ain't fuckin' hurt you yet, but I'm going to." He again said, "Please quit. I don't want this," and got into his vehicle. Carson can be heard knocking on the vehicle's window before Matt drove away. While he was driving away, he said aloud to himself, "Cassie is batshit crazy. I wish her the best of luck but fuck it, I've got to get a divorce."

---

[21] Prior to admitting the video, the trial court asked defense counsel if it had an objection. As it is unclear what counsel's response was we will rely on the arguments made in its motion in limine and will consider it properly preserved for appellate review.

During Tpr. Stovall's testimony the Commonwealth had him read two entries from Matt's medical records from the incident aloud to the jury. The first was: "[Patient] reports that his wife tried to stop him from leaving, stepping on his shoe and making him fall on his knee." The second was a form question which read: "Because people who are experiencing fear or abuse in their relationships have limited access to resources, we offer assistance to all our [patients]. Is there something we can help you with today?" Matt had responded "Y" to that question, and next to that response the form said: "Document: WIFE/POLICE REPORT." During Tpr. Stovall's cross-examination by the defense, he testified that prior to going to the hospital for treatment Matt told him that Carson had injured his knee by throwing her whole body into it.

When Carson was cross-examined by the Commonwealth about the video, she claimed that she did not laugh because she hurt Matt but because "he threw himself down the hallway." She further asserted that she did not remember grabbing Matt's privates and she did not remember ripping his shirt "the way it was ripped" in the photograph Tpr. Stovall took of him.

In its closing argument, the Commonwealth argued that in the Dearborn video Carson chased Matt out of his own home, and that the July 2019 video was the first time he stood up to Carson. And, that the one time he stood up to her in his own home resulted in his death. It compared the Dearborn video with the July 2019 video to demonstrate that Carson was within arm's reach of Matt during both of them rebut her claim that she was afraid to get near him on the night of the murder. It further asserted that the reason Carson yelled

that Matt had choked her several times in the July 2019 video was because she knew she was being recorded and knew that the Dearborn video had been used against her in court.

### 1) *The Dearborn Incident Video*

Carson first argues that the trial court erred by admitting the Dearborn incident video because it was not sufficiently similar to the July 2019 incident to warrant its admission under KRE 404(b). In response, the Commonwealth asserts that the evidence was admissible under our long-established precedents that allow the admission of prior acts of violence against the same victim. It further argues that the video was admissible to rebut Carson's contention that, prior to the murder, Matt had assaulted her and that she feared for her life. We agree with the Commonwealth.

KRE 404(b) forbids the admission of "[e]vidence of other crimes, wrongs, or acts" to "prove the character of a person in order to show action in conformity therewith." However, the same rule permits such evidence if it is offered for some other purpose such as proof of intent, plan, or absence of mistake or accident. KRE 404(b)(1). It is well-established in our jurisprudence that "evidence of prior, similar acts of abuse against the same victim of the alleged crime is 'almost always admissible' under KRE 404(b) to prove the defendant's 'intent, plan, or absence of mistake or accident.'" *Dant v. Commonwealth*, 258 S.W.3d 12, 19 (Ky. 2008) (quoting *Noel v. Commonwealth*, 76 S.W.3d 923 (Ky. 2002), *overruled on other grounds by Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018)). Unless of course the evidence's

probative value is substantially outweighed by a risk of undue prejudice to the defendant. *Id.*; *see also Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994).

Here, the Dearborn incident was sufficiently similar to the July 2019 incident to warrant its admission as a prior act of violence against the same victim. In both videos Carson is clearly the aggressor, she assaults and insults Matt, and in both videos Matt attempts to deal with Carson by asking her to stop hitting or hurting him. And, importantly, the Dearborn video is highly probative of the fact that Carson was not afraid of Matt and that she was the aggressor on the night he was killed. This evidence tended to disprove her claim of EED, which was the primary issue for the jury to decide. Moreover, as the Dearborn incident occurred one year and one month prior to the incident that caused Matt's death, it was not too remote in time so as to reduce its probative worth. *Driver v. Commonwealth*, 361 S.W.3d 877, 884-85 (Ky. 2012) (holding that prior acts of violence against same victim that occurred over four years and five years prior, respectively, to the charged crime were not too remote in time to reduce their probative value); *but see Barnes v. Commonwealth*, 794 S.W.2d 165, 196 (Ky. 1990) (holding prior acts of violence against the same victim, the most recent occurring four and one half years ago was too remote in time to have much probative worth).

Given the video's extremely high and crucial probative value, we cannot hold that its probative value was substantially outweighed by its risk of undue

prejudice. The trial court did not abuse its discretion by admitting the video, and we affirm.

### 2) *Matt's Medical Records*

Before this Court, Carson argues that the trial court erred by admitting Matt's medical records from the Dearborn incident because they identified "his wife" as his attacker. She asserts this was reversible error under our case law that generally excludes a victim's identification of the perpetrator from the hearsay exception housed in KRE 803(4) "Statements for purposes of medical treatment or diagnosis."[22] At trial, Carson first objected to the admission of the medical records on the grounds that they had not been properly authenticated and Tpr. Stovall lacked sufficient personal knowledge of their contents. But, later, when the Commonwealth moved to admit the medical records, the following exchange occurred:

> **CW:[23]** Your honor I would like to move to admit this as Commonwealth's exhibit [8].
>
> **Court:** Any objection?
>
> **Defense:** Are those the medical records?
>
> **CW:** Yes.

---

[22] While Carson's statement of the law is correct, we note that because she pled guilty to attacking Matt and causing the injury discussed in his medical records prior to this trial, and because the jury had already seen the Dearborn incident video, it was undisputed that Carson was his attacker during that incident. *Cf. Bray v. Commonwealth*, 68 S.W.3d 375 (Ky. 2002); *Barnes v. Commonwealth*, 794 S.W.2d 165 (Ky. 1990). In addition, Carson was not on trial for the conduct alleged in Matt's medical records as was the case in both *Justice v. Commonwealth*, 636 S.W.3d 407, 414 (Ky. 2021), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227 (Ky. 2022); and *Colvard v. Commonwealth*, 309 S.W.3d 239, 243 (Ky. 2010).

[23] Commonwealth.

**Defense:** No objection, your honor.

Similar to our holding regarding the admission of the two recorded phone calls in Section II(B)(2) *supra*, we conclude this alleged error was waived rather than unpreserved. Defense counsel was informed prior to trial that the Commonwealth intended to introduce Matt's medical records from the Dearborn incident and would have been aware that those records identified Carson as Matt's attacker. Yet the defense stated it had no objection to the admission of the records at trial. We consequently decline to address this issue. *Howard*, 595 S.W.3d at 475; *Tackett*, 445 S.W.3d at 29.

### D. Tpr. Stovall's and Det. Crump's testimony

Carson's next claims of error concern the testimony of Tpr. Stovall and Det. Crump. First, Citing KRE 602 and KRE 701, she argues that the trial court erred by allowing Tpr. Stovall[24] to improperly narrate or interpret still photographs from the Dearborn incident video, and by allowing Det. Crump to improperly narrate or interpret the July 2019 video, the recorded conversation between Carson and Roxanne, the pool video, and the recorded conversation between Carson and Robert.

---

[24] Carson's brief alleges that Det. Crump also improperly interpreted the Dearborn video by identifying it as the one in which Carson assaulted and injured Matt. But upon review of the record, that was the Commonwealth's characterization of the video, not Det. Crump's. Det. Crump testified that he found the Dearborn video on a thumb drive attached to Matt's keys, to which the Commonwealth asked, "The one where the defendant assaulted and injured Matt Turner?" Det. Crump responded, "From Indiana, relating to Tpr. Stovall, yes." There is accordingly no reason for this Court to address that argument.

After the Dearborn video was played during Tpr. Stovall's testimony the defense objected to the admission of still shots from the video on the basis that they were not relevant and that they were cumulative since the jury had access to the full video. At no point did the defense argue that Tpr. Stovall had improperly interpreted the video or photographs. This issue is therefore unpreserved, but Carson has requested palpable error review pursuant to RCr[25] 10.26. A palpable error is an error that is "easily perceptible, plain, obvious and readily noticeable[,]" and must be "so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *See, e.g., Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To conclude palpable error occurred a reviewing court must "[believe] there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable." *Id.*

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. . .

[KRE] 602. Thus,

> narration of a [recording] may be proper but only if it is comprised of opinions and inferences that are rationally based on the witnesses' own perceptions of which he had personal knowledge and that are helpful to the jury. Furthermore, witnesses are limited to a description of events when narrating [a recording] and any interpretation of that footage is improper.

---

[25] Kentucky Rule of Criminal Procedure.

*Commonwealth v. Wright*, 467 S.W.3d 238, 246 (Ky. 2015) (quoting *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014)). "[A] witness 'may not *interpret* audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence.'" *Morgan v. Commonwealth*, 421 S.W.3d 388, 392 (Ky. 2014) (quoting *Cuzick v. Commonwealth*, 276 S.W.3d 260, 265-66 (Ky. 2009)).

When discussing one of the still photographs captured at the beginning of the Dearborn video, Tpr. Stovall explained that it showed Matt with Carson's arm wrapped around him. The Commonwealth asked if it appeared to be in a loving way, and he responded, "I wouldn't say so." Another photograph was of the exterior of the home and Tpr. Stovall testified that the two individuals that could be seen in the reflection were Carson and Matt. We agree that, because Tpr. Stovall did not personally observe the Dearborn incident and had no personal knowledge of it, this testimony was improper interpretation. *See Wright*, 467 S.W.3d at 246.

Nevertheless, this Court held that a similar error was not reversible in *Boyd*, "because the jurors were watching the video and were in a position to interpret the security footage independently from the testimony, which provides fair assurance that the judgment was not 'substantially swayed by the error.'" 439 S.W.3d 126, 132 (Ky. 2014). In this case, the jury watched the Dearborn video and were in a position to determine what the still photographs depicted for themselves.

For the same reasons, we hold that none of the numerous portions of Det. Crump's testimony Carson argues against, none of which were properly preserved,[26] amounted to palpable error. Carson first challenges Det. Crump's interpretation of the recorded phone call between her and Roxanne. But the jury got to hear that call and Carson testified regarding what she said on the call that conflicted with Det. Crump's interpretation. She also challenges Det. Crump's testimony regarding what time Matt drank the moonshine Bill gave to him during the pool video, but the two- and one-half hour long video was played in its entirety for the jury, and the time at which Matt took the drink at the pool became irrelevant upon Carson testifying at trial that Matt did not become "mean" until they got back to his apartment. Third, she challenges various pieces of testimony by Det. Crump regarding the number of times Matt and Carson said certain phrases during the July 2019 video, where they were standing at various points in the video, and things they said during the video. Finally, she argues that Det. Crump improperly interpreted the phone call between Carson and Robert. The jury watched the July 2019 video several times and listened to the call between Carson and Robert for themselves and

---

[26] Carson claims that two of her arguments are preserved. The first concerns Det. Crump's testimony about a blurry still photograph from the 2019 video that showed the ceiling fan in the living room and two figures standing on either side of the photograph's frame. At trial, the defense acknowledged the photograph was not unduly prejudicial and objected to it on relevance grounds. Carson's argument on appeal that he impermissibly interpreted the photograph is therefore unpreserved.

The other argument she claims is preserved is against Det. Crump's testimony that Matt did not appear to be manifestly under the influence to him in the pool video or the July 2019 video. Det. Crump did not testify to this until re-direct after the defense opened the door to that testimony on cross by asking Det. Crump about Matt's level of intoxication.

could therefore decide for themselves what occurred and what was said. *Boyd*, 439 S.W.3d at 132.

At bottom, none of her arguments against Det. Crump's testimony lead this Court to believe the outcome would have been different in its absence. Carson acknowledged her guilt in violating the protective order and further acknowledged she was responsible for taking Matt's life. Her only defense was that she was not guilty of his murder because either: (a) she did not stab him with the knife, but instead threw it and it accidentally went several inches deep into his neck, or (b) she acted under EED. First, even if the jury were to believe she only threw the knife, it was instructed on wanton murder. Certainly, a reasonable juror could find that throwing an eight-inch kitchen knife at someone thereby causing their death was wanton conduct manifesting extreme indifference to the value of human life. *See* KRS 507.020(1)(b). As for her second defense, EED "[must have a] reasonable explanation or excuse[.]" *Greene v. Commonwealth*, 197 S.W.3d 76, 82 (Ky. 2006). It is abundantly apparent from the video that she was furious with Matt for not going to get her things. Becoming so upset that you stab someone in the neck over your belongings cannot be considered a reasonable explanation or excuse.

For the same reasons, we find no merit in Carson's numerous unpreserved arguments that Det. Crump's testimony constituted impermissible hearsay, improper opinion evidence, or improper bolstering.[27] Having

---

[27] Carson asserts that two of the issues were preserved. The first is her argument that Det. Crump repeated what the medical examiner had already testified to. At trial, the trial court agreed with the defense's objection and the defense did not

concluded there is no substantial possibility to believe the absence of either Tpr. Stovall's or Det. Crump's challenged testimony would have changed either of the jury's verdicts, we affirm.

### E. Questioning of DPA[28] Investigator Blair

Carson's next assertion of error is that the trial court abused its discretion by allowing the Commonwealth to call as a witness and question DPA investigator Doug Blair regarding the collection of Carson's cellphone.

When the police picked Carson up from Nick's home, she left her phone behind. Nick did not give her phone to law enforcement when they returned to his home to retrieve it later that day, and instead gave the phone to DPA Investigator Doug Blair. Three years later, when the Commonwealth became aware that Investigator Blair had the phone, it asked the defense to provide it. Defense counsel declined and requested that the Commonwealth get a search warrant for it. On January 17, 2023, the Commonwealth obtained a search warrant for "**specifically the Office of Mr. Douglas Blair**, to seize a cell phone belonging to [Carson]." When law enforcement executed the search warrant, an individual that worked in the DPA office went into Investigator Blair's office,

---

request an admonition. There is no error on appeal. *See Allen v. Commonwealth*, 286 S.W.3d 221, 225-26 (Ky. 2009).

The second instance was not an objection to the Commonwealth eliciting evidence that Carson told Josh that Matt would restrain her when she was high to protect both her and himself. Rather, the defense was confirming that Josh's testimony was the only evidence of that the Commonwealth intended to elicit, as the court had previously ruled that it was going to exclude all other instances of Carson becoming aggressive while high apart from Josh's testimony.

[28] Department of Public Advocacy.

retrieved the phone, and gave it to the officers so that they would not enter the secured area of the building that contained confidential client information.

During a hearing two months before trial, the Commonwealth noted that, because Investigator Blair had the phone for three years, it was going to have to call him as a witness in order to establish chain of custody for it unless the defense was willing to stipulate to chain of custody. The defense refused to stipulate at that time. At trial, the defense changed its stance on being willing to stipulate to chain of custody just before the Commonwealth called Investigator Blair as a witness, but the Commonwealth wanted to proceed with its questioning. Defense counsel asserted that the Commonwealth wanted to question Investigator Blair so that it could establish that he falsely represented to Nick that he was an investigator for the prosecution. The court noted that the only testimony the Commonwealth needed to elicit was who Investigator Blair got the phone from and who he gave it to and allowed the Commonwealth to proceed with its questioning.

Investigator Blair testified, with several objections from the defense throughout his testimony, that he was investigator for the defense and was not a sworn police officer; that when he interacted with people on behalf of DPA, he tells them he works for defense attorneys; that he has never represented to a witness that he worked for the Commonwealth; that he got Carson's phone from Nick at a restaurant, but he could not remember on what date that occurred; and, after he got the phone from Nick, he brought it back to his office and the police took it from his office pursuant to a search warrant. Later,

50

during the Commonwealth's cross-examination of Nick, he testified that he gave Carson's cellphone to an investigator for the defense at a restaurant, and that Investigator Blair told him that he was a Commonwealth's investigator.

Before this Court, Carson argues that the trial court erred by allowing the Commonwealth to improperly impeach Investigator Blair on a collateral matter, citing *Tigue v. Commonwealth*, 600 S.W.3d 140 (Ky. 2018). Carson never asserted that argument to the trial court, rendering it unpreserved for our review. However, Carson has requested review for palpable error. We will accordingly affirm unless we conclude that the Commonwealth's questioning of Investigator Blair was error and that there is a substantial possibility that the result would have been different absent that error. *Brewer*, 206 S.W.3d at 349.

We first note for clarity that the trial court did not err by allowing the Commonwealth to question Investigator Blair in order to establish the chain of custody of Carson's cellphone. While the Commonwealth could have acquiesced to the defense's offer to stipulate, it was under no obligation to do so. Thus, this case is distinguishable from *Tigue* as, in that case, the trial court allowed the Commonwealth to call the challenged witness to testify solely for the purpose of impeaching another one of the Commonwealth's witnesses. 600 S.W.3d at 152-53. Whereas, here, Investigator Blair was called to establish chain of custody and the Commonwealth further questioned him on whether he misrepresented his affiliation to Nick. Nevertheless, the manner in which Investigator Blair to identified himself to Nick was certainly a "collateral" matter in this case, as it had no bearing on either the chain of custody itself or

51

the charged offenses. We therefore agree that the Commonwealth impeached Investigator Blair on a collateral matter.

Nevertheless, we cannot hold that, absent the error, the outcome in this case would have been any different. Nick's testimony that Investigator Blair identified himself as investigator for the Commonwealth occurred *seven days* after Investigator Blair testified that he never identified himself in that manner to a witness. Even assuming that nuance would not be lost on a lay person, to conclude that momentary testimony swayed the jury's verdict in what was otherwise a veritable sea of evidence is flatly ludicrous, and any error in admitting the testimony was not palpable.

**F. Cumulative Error**

Finally, Carson requests that her convictions be overturned pursuant to the cumulative error doctrine which recognizes that the cumulative effect of multiple, non-reversible, errors can require reversal. *See, e.g., Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (citing *Funk*, 842 S.W.2d at 483)). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. If the errors have not individually raised any real question of prejudice, then cumulative error is not implicated." *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky.2010). (internal citations and quotation marks omitted). Cumulative error did not occur in this case.

52

### III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Shannon Dupree
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General